# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### MARTINSBURG

KATHY C. MCINTIRE,

       **Plaintiff,**

v.                                                    **Civil Action No.: 3:13-CV-143**
                                                      **JUDGE GROH**

CAROLYN COLVIN,
Acting Commissioner of Social Security,

       **Defendant.**

## REPORT AND RECOMMENDATION

## I.      INTRODUCTION

On October 14, 2013, Plaintiff Kathy C. McIntire ("Plaintiff"), by counsel Louis H. Khourey, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1). On December 31, 2013, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 8; Administrative Record, ECF No. 9). On January 30, 2014 and March 17, 2014, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 12; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 15). Following review of the motions by the parties and the administrative record, the undersigned now issues this Report and Recommendation to the District Judge.

## II.    BACKGROUND

### A.    Procedural History

On November 10, 2010, Plaintiff protectively filed her application for Disability Insurance Benefits ("DIB") alleging disability that began on October 28, 2009. (R. 193). This claim was initially denied on March 3, 2011 (R. 144) and was denied again upon reconsideration on May 6, 2011 (R. 150). On June 20, 2011, Plaintiff filed a written request for a hearing (R. 157), which was held before United States Administrative Law Judge ("ALJ") Jeffrey P. La Vicka on September 6, 2012 in Morgantown, West Virginia. (R. 41-113). Plaintiff, represented by counsel Louis H. Khourey, Esq., appeared and testified, as did Larry Bell, an impartial vocational expert. (R. 41). On September 17, 2012, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 21-35). On October 15, 2012, Plaintiff filed a request for review of the ALJ's decision to the Appeals Council. (R. 16-17). On September 23, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-4).

### B.    Personal History

Plaintiff was born on July 28, 1969 and was forty-one (41) years old at the time she filed her first SSI claim. (R. 47). She was married at the time of the ALJ hearing and had no children. (*Id.*). She completed high school and has two associate's degrees from West Virginia Northern Community College, one in nursing and a second in surgical technology. (R. 48-49). Plaintiff worked as registered nurse from 1995 to 2006. (R. 50-51). She also worked as a surgical technician from 1992 to 1995. (R. 231). Plaintiff quit working in May 2006 because her pain symptoms were worsening and she was unable to do the job any longer due to her medical conditions. (R. 51).

Plaintiff previously filed an application for a period of disability and disability insurance

benefits on March 30, 2004, which was denied in August 2004. (R. 21). Plaintiff then reapplied for benefits on August 31, 2007 alleging disability beginning on February 1, 2007. (*Id.*). After her claims were denied initially and on reconsideration, Plaintiff requested a hearing, which was held on October 27, 2009 before ALJ Norma Cannon. (*Id.*). ALJ Cannon issued an unfavorable decision on September 17, 2012 (R. 114-128) and the Appeals Council denied review on March 16, 2011.

Plaintiff testified that her condition has worsened since she last worked in 2006. (R. 61). Plaintiff stated that her pain, numbness in her legs, fibromyalgia, carpal tunnel syndrome, tachycardia, menopausal symptoms and difficulty sleeping were all worse than before. (*Id.*).

## C.  *Medical History*

Plaintiff's medical conditions include both mental and physical impairments. Plaintiff's medical conditions include: chronic fatigue, which causes weakness and reduced stamina; migraines/chronic headaches; depression, panic attacks, and anxiety; chronic pain; syringomyelia which is the development of cysts in her back; cystitis which causes bladder problems; tachycardia; fibromyalgia; myofascial pain syndrome; carpal tunnel syndrome symptoms; hormonal problems; hypothyroidism; pelvic congestion syndrome; and endometriosis. (R. 45-46). Additional non-severe impairments include hiatal hernia, hemorrhoids and gastroesophageal reflux disease ("GERD"). (R. 59). These conditions result in pain, poor balance, numbness and tingling in lower extremities, the need to urinate frequently and difficulty maintaining focus, concentration and memory issues. (R. 46, 59).

### 1.  Medical History Pre-Dating Alleged Onset Date of October 28, 2009

The record contains Plaintiff's progress notes regarding her reproductive health treatment by Dr. DeGuzman dating from May 26, 2000 to November 12, 2010. (R. 404-33). These records

include Plaintiff's D&E procedure in 2000 and her post-operative treatment (R. 433). The records include annual pap smears and colposcopies and note irregularities during wellness visits, including the presence of cysts on Plaintiff's cervix and left ovary (R. 420) and experiencing pain in her abdomen and back (R. 419). Throughout these treatment notes, Plaintiff was on multiple prescription drugs including Ambien for her sleep disturbances, Percocet and Flexeril to treat pain and stiffness, and Toprol for chest pain and high blood pressure. (R. 422).

In August 2006, Plaintiff received an MRI which indicated the presence of a spinal syrinx, which resulted in her syringomyelia diagnosis. (R. 424, 426).

On September 21, 2006, Plaintiff stated that she was experiencing neurological problems and saw a neurosurgeon and had an appointment scheduled with a neurologist. (R. 424). Plaintiff also went to John Hopkins for a second opinion regarding her neurological symptoms. Physicians there ratified the opinions of neurologists and the neurosurgeons, indicating that her spinal condition is relatively stable and there is no need for surgery. (R. 351).

On June 6, 2007, Plaintiff reported seeing a physician for tachycardia. (R. 422). By September 2007, Plaintiff was on a number of medications for her heart condition. (*Id.*).

On January 7, 2009, Plaintiff underwent a laparoscopy with Dr. DeGuzman due to her chronic abdominal and pelvic pain. (R. 417, 451). Following the operation, Plaintiff's diagnoses were rule out mild endometriosis and pelvic congestion syndrome. (R. 451). Plaintiff had follow-up appointments for the surgery mid-January and early February. (R. 416).

In July 2009, Plaintiff began seeing Dr. Alfredo Aguirre, a psychiatrist with Park Valley Behavioral Health, for her mental conditions, which included depression, anxiety, insomnia and difficulty concentrating. (R. 353). Plaintiff had appointments with Dr. Aguirre on July 9, 2009, July 29, 2009, August 26, 2009, September 15, 2009, October 1, 2009, October 5, 2009 and

October 14, 2009. (*Id.*). Dr. Aguirre prescribed psychotropic medication during this time, including Remeron, Xanax and BuSpar. (*Id.*).

On October 10, 2009, Plaintiff presented to Ohio Valley Medical Center Emergency Room complaining of abdominal pain that she has had for three years. (R. 398). Plaintiff stated that she has "had many workups and nobody has ever found anything." (*Id.*). Plaintiff reported that she was nauseated, has anxiety and difficult sleeping despite taking medication. (*Id.*). The physical examination showed that Plaintiff was in no acute distress and revealed overall normal findings. (*Id.*). Plaintiff was given Phenergan for nausea and an injection of Ativan for her anxiety. (R. 399). Laboratory tests were largely normal, including a Beta-hCG, an acute abdominal series and a urinalysis. (*Id.*). The abdominal x-ray revealed a moderate amount of fecal matter through the colon, no abnormal soft tissue density and small phleboliths, or calcification within a vein, in the pelvis, as well as calcification superimposed on both upper quadrants which were probably costochondral calcifications. (R. 400). An x-ray of her chest and abdomen was normal showing a non-specific bowel gas pattern and no abnormal soft tissue density. (R. 401). Phleboliths were noted in the pelvis. (*Id.*). Dr. Midcap gave Plaintiff fourteen days of her medications and encouraged her to follow-up with a new physician or return to the ER if she develops any new or worsening symptoms. (*Id.*). The physical impression at discharge was chronic abdominal pain. (*Id.*).

### 2.     Medical History Post-Dating Alleged Onset Date of October 28, 2009

Plaintiff continued to have regular mental health appointments with Dr., Aguirre, her treating psychiatrist, on November 2, 2009 (R. 351), November 9, 2009 (R. 353), November 19, 2009 (*Id.*) and December 7, 2009 (R. 349). During these visits, Plaintiff continued to report problems with anxiety and sleep. Dr. Aguirre prescribed and monitored Plaintiff's psychotropic

medications, which throughout 2009 and 2010 included Remeron, Xanax, Ambien, BuSpar, Seroquel, Vistaril, Valium, Clonidine, Restoril. (R. 353).

Plaintiff presented to the Ohio Valley Medical Center Emergency Room reporting anxiety attacks, increased feelings of anxiety and worsening of insomnia on November 9, 2009 (R. 396), November 13, 2009 (R. 394), November 19, 2009 (R. 392), November 26, 2009 (R. 391), December 4, 2009 (R. 389), December 6, 2009 (R. 387), December 9, 2009 (R. 385) and December 12, 2009 (R. 291, 384). At some of these visits Plaintiff also reported experiencing a migraine, accompanied by nausea. Plaintiff also stated that her medications did not seem to help her conditions and that she was only sleeping about two hours a night, if at all. Her physical examinations were overall normal. At these visits, Plaintiff would be given an injection of Ativan and small doses of medication to take home as needed for anxiety and sleep. Plaintiff's clinical impressions at discharge were typically anxiety disorder, panic attacks and insomnia.

In the winter of 2009, Plaintiff also began seeing Dr. Govindan regarding her sleep disturbances. On November 19, 2009, Dr. Aguirre had a conversation with Dr. Govindan regarding Plaintiff's participation in a sleep study to address her insomnia. (R. 350). Dr. Govindan stated he was going to try Xyrem, a potent hypnotic medication, to treat Plaintiff's sleep disturbances. (*Id.*). Plaintiff participated in the sleep study in early December 2009. (R. 385).

On December 14, 2009, Plaintiff was admitted to Hillcrest Behavioral Health Services at the Ohio Valley Medical Center. (R. 295). Plaintiff was admitted for stabilization and treatment for her feelings of intense anxiety. (*Id.*). Plaintiff's medical history at the time included "three to four year history of problems with insomnia and chronic abdominal pain…and generalized fatigue." (R. 299). Dr. Aguirre further noted that Plaintiff had been visiting emergency rooms "frequently in order to obtain relief for anxiety." (R. 295). Plaintiff had visited an emergency room eight times

within the last month for anxiety-related issues. (R. 302). Dr. Aguirre stated:

> [i]t is worrisome in this case that the patient has been visiting multiple Emergency Rooms in order to obtain short courses of benzodiazepines. It is very likely that the patient is dependent on benzodiazepines, and this is compounding her problem of anxiety. Initially, I will start doing detoxification from benzodiazepines.

(R. 297). Her diagnoses included depression and anxiety disorder, not otherwise specified and rule out diagnoses of somatoform disorder, hypochondriasis and benzodiazepine abuse. (R. 297). Her physical diagnoses at this time included:

> 1) chronic abdominal pain unexplained through multiple workups; 2) migraine history; 3) history of orthostatic tachycardia; 4) insomnia; 5) previous finding of a spinal cord syrinx around T9 to L1 with most recent MRIs showing resolution of that finding as of 2007; 6) possible irritable bowel syndrome; 7) facial rash may be consistent with rosacea but cannot rule out an autoimmune etiology; 8) low potassium; 9) endometriosis by history; 10) diagnosis of 'borderline' Chiari formation, according to neurosurgical consultant Dr. Bajoni; 11) Benzodiazepine use as an outpatient trying to counter her insomnia; and 12) mild elevated total protein identified on multiple occasions.

(R. 299). During her stay at the hospital, Plaintiff showed "some degree of anxiety" (R. 295). She was treated with Valium and showed some decrease in anxiety and improvement in her sleep. (R. 295, 298). Plaintiff's condition improved and she was discharged with a referral to Dr. Aguirre's office on December 17, 2009. (*Id.*).

On December 28, 2009, Plaintiff had an appointment with Dr. Aguirre following her discharge from the hospital. (R. 347). Plaintiff reported persisting anxiety, problems with sleep and a variety of somatic symptoms, including headaches and nausea. (*Id.*). Plaintiff denied suicidal ideas, intentions or plans. (*Id.*). Dr. Aguirre noted "this is a case that could be a good candidate for judicious use of benzodiazepines. Very few medications have been helpful for her, including multiple trials of antidepressants and some antipsychotics." (*Id.*). Dr. Aguirre increased Plaintiff's Valium prescription and discussed with Plaintiff the need for a clear medication contract given the

use of a controlled substance. (*Id.*). Plaintiff showed a good understanding of treatment issues and was told to return in one month. (*Id.*).

On January 3, 2010, Plaintiff presented to the Ohio Valley Medical Center Emergency Room with abdominal pain, nausea and vomiting. (R. 382). Plaintiff explained to Dr. Hrutkay that she had problems with vomiting since being released from Hillcrest when her Remeron prescription was increased. (*Id.*). Plaintiff reported that she had been using suppositories and enemas without any relief of her constipation. (*Id.*). The physical examination revealed that Plaintiff was in minimal distress and showed mainly normal findings except some mild tenderness to palpation just beneath the periumbilical abdominal area. (*Id.*). Plaintiff was given IV Dilaudid for pain and Zofran to prevent nausea and vomiting and reported feeling much improved. (*Id.*). Plaintiff underwent a series of laboratory work while admitted. (R. 383). Her beta HCG was negative, her basic metabolic panel was mainly normal and an abdominal series showed a large amount of stool. (*Id.*). Upon discharge, Plaintiff was given medication to help relieve her pain, constipation and nausea. (*Id.*).

Plaintiff had mental health appointments with Dr. Aguirre on January 13, 2010 (R. 346) and January 29, 2010 (R. 353). During her January 13th appointment, Plaintiff reported some tiredness but had noticed some slight improvement in her level of anxiety and depression. (*Id.*). At this time, Dr. Aguirre decided not to continue the Valium "given the significant compliance problems and the risk of overdose." (*Id.*). Plaintiff was continued on the Remeron and Ambien. (*Id.*). On February 16, 2010, however, Plaintiff reported no major changes in her mood and noted that her level of activity was still very low and she had persistent headaches. (R. 345). Plaintiff did report a slight improvement in her sleep with sleep almost three to four hours every night. (*Id.*). Plaintiff was continued on the same medication. (*Id.*).

On March 8, 2010, Plaintiff presented to an appointment with cardiologist, Dr. Edward Chiu, M.D., with blood pressure fluctuations. (R. 323). Plaintiff also reported a new endometriosis diagnosis, abdominal pain and back pain, tachycardia with blood pressure in the 150s and 160s and overall not feeling well. (*Id.*). She also reported sweating a lot, chest pain or discomfort that comes and goes every day, shortness of breath, dyspnea while waking inside and after climbing ten steps of stairs, nausea with migraine headaches up to three days a week, dizziness after walking for a few minutes, no fainting but sometime vision got "goofy" and no motor or sensory disturbances. (R. 323-24). The physician conducted an ECG at the appointment and recommended a cardio/electrocardiogram ("EKG"). (R. 324). Plaintiff had follow-up appointments with Dr. Chiu on May 12, 2010 (R. 321) and September 20, 2010 (R. 317) where she continued to report systemic symptoms including sweating, migraine headaches lasting three to four days straight at a time, cardiovascular symptoms, including chest pain, "knife like pain" and tachycardia palpitations, dyspnea, or shortness of breath that fluctuates each day and is more noticeable after climbing ten steps of stairs, normal appetite, no dysphagia and no heartburn, nausea usually with migraine and vomiting, previous history of constipation, dizziness when she stands up and feeling off balance a lot, no fainting but a few days felt "blackness," no motor or sensory disturbances, gallbladder pain, insomnia with only two hours of sleep per night, weight gain and pedal and hand edema. (R. 319). Plaintiff's diagnosis history included tachycardia (positional), chest pain, esophageal reflux, hiatal hernia, headache symptoms, syringomyelia and a history of dizziness. (R. 321).

On March 22, 2010, Plaintiff presented to Dr. Saloni Sharma, M.D., a rehabilitation and pain specialist, with her chief complaint being diffuse body pain. (R. 338). Dr. Sharma conducted a complete social, familial and medical history on Plaintiff and performed a physical examination.

(*Id.*). Plaintiff reported that in 2002 she developed symptoms of low back and lower extremity pain and she was eventually diagnosed with a thoracic syrinx. (*Id.*). Plaintiff also reported pain in her arms, legs, shoulder, and abdomen as well as headaches. (*Id.*). She has been told that she possibly has fibromyalgia. (*Id.*). Plaintiff described the pain as a seven to eight out of ten, dull, aching and tingling feeling in her low/mid-back, legs, right shoulder and base of her head. (*Id.*). Plaintiff stated her pain was worse with increased activity as well as with straining and that the pain is not relieved with rest or the use of pain medications. (*Id.*). Plaintiff stated she had tried physical therapy and had been seen at other pain clinics. (*Id.*). The physical examination revealed full cervical range of motion but lumbar flexion and extension were limited in all places. (*Id.*).There was diffuse tenderness with palpation throughout the cervical and lumbar paraspinals and there were greater than fourteen tender points positive. (*Id.*). Manual muscle testing of the upper and lower extremities revealed strength to be 5/5 with sensation to light touch intact in the upper and lower extremities although Plaintiff noted distally in her hands and feet bilaterally that her sensation is decreased compared to proximally. (*Id.*). The Spurling maneuver and straight leg raise were both negative bilaterally. (*Id.*). Reflexes were 2+ and symmetric in the upper and lower extremities. (*Id.*). Babinski Sign was plantar on the right and equivocal on the left. (*Id.*). The neurologic examination revealed Plaintiff to be alert and oriented times three. (*Id.*). Dr. Sharma also reviewed multiple films and reports and noted that the MRI of the right shoulder dated January 25, 2008 revealed mild degenerative changes of the acromioclavicular joint, an MRI of the thoracic spine from June 30, 2007 revealed spinal cord signal abnormality at the T12 level that was less prominent than in the 2006 study, a cervical spine MRI dated June 2007 was unremarkable and there was no evidence of a cervical cord spinx and finally an MRI dated 2006 revealed a small area of fluid compatible with syringomyelia and there was also mild scoliosis. (R. 340). Dr.

Sharma also reviewed an MRI of the lumbar spine dated November 4, 2009, which was unremarkable. (R. 336). She also reviewed an EMG/NCV dated May 2007 that was normal. (*Id.*). A somatosensory of the upper extremities dated 2006 "revealed the possibility of obstruction of the sensory pathway in the lower extremities with possible decreased sensory pathway in the right spinal cord." (*Id.*). Dr. Sharma recommended a correlation with an MRI. (*Id.*). Dr. Sharma diagnosed Plaintiff with 1) fibromyalgia, 2) thoracolumbar syrinx, 3) medication management, and 4) complex past medical history with diagnoses of chronic fatigue, insomnia, depression, anxiety, endometriosis, pernicious, anemia, migraines, mild scoliosis, tachycardia, borderline Arnold-Chiari Syndrome, irritable bowel syndrome, and leucopenia. (*Id.*). Dr. Sharma noted that Plaintiff had been seen by "multiple specialists including Neurology, Rheumatology, Neurosurgery, Gynecology and Gastroenterology. She has also been evaluated at John Hopkins and at the Cleveland Clinic." (*Id.*). As for the plan moving forward, Dr. Sharma explained that she would like to wean Plaintiff off of her narcotic pain medication and Plaintiff was interested in proceeding with the narcotic weaning. (*Id.*). Plaintiff was then given a prescription for Percocet to be filled after she finished her current Oxycodone prescription. (*Id.*).

Plaintiff presented for follow-up appointments with Dr. Sharma for pain management on April 20, 2010 (R. 336), May 24, 2010 (R. 334), June 28, 2010 (R. 332), July 27, 2010 (R. 330), August 23, 2010 (R. 328) and September 20, 2010 (R. 326). Throughout these appointments, Plaintiff continued to report diffuse body pain described as dull and aching with a tingling feeling at times in her mid- and low back, which could be as severe as eight out of ten. Her most painful areas were her right upper quadrant and lower back with her back pain being worse with prolonged sitting as well as with bending forward and backward. Plaintiff stated has sleep disturbances "at times" secondary to pain. Plaintiff noted she has had several migraines and has been in contact

with a neurologist regarding the condition. The physical examinations typically revealed "tenderness with palpation throughout the lumbosacral spine." The manual muscle tests in the lower limbs regularly revealed strength to be 5/5 with sensation to light touch intact in her lower extremities but becoming decreased from her mid-lower extremity distally. Her straight leg raise tests were negative bilaterally. Dr. Sharma's diagnostic impressions throughout these appointments included 1) fibromyalgia, 2) history of thoracolumbar syrinx with no evidence of syrinx on most recent MRI, 3) recent findings of gallstones, and 4) medication management. Plaintiff continually weaned off of her Percocet prescription during this time. At her August 2010 appointment, Plaintiff denied any side effects from the medication and noted that the medicine was enabling her to function.

On April 27, 2010, Plaintiff presented to her primary care physician, Dr. Matthew Sokos, M.D., with abdominal pain lasting for three weeks, constipation and feeling tired and anxious. (R. 312). The physician recommended an ultrasound of Plaintiff's gallbladder and referral for Plaintiff's severe constipation. (R. 312). On April 30, 2010, Plaintiff received an ultrasound of her abdomen due to right upper quadrant pain and postprandial nausea. (R. 316). Plaintiff's liver and pancreas were both normal. (*Id.*). The gallbladder results revealed "at least two echogenic calculi measuring approximately 5mm in diameter each" with "no gallbladder wall thickening, sludge, or pericholecystic fluid." (*Id.*). The sonologist did note tenderness when scanning over the gallbladder. (*Id.*). The impression of the MRI was "cholelithiasis with some gallbladder tenderness. No other sonographic findings to confirm a diagnosis of cholecystitis – clinical correlation is needed." (*Id.*).

On July 9, 2010, Plaintiff underwent a lumbar MRI at the request of Dr. Sokos because of back pain, paresthesia and a previous abnormal scan. (R. 314). The MRI failed to show any lumbar

disc herniation or spinal stenosis but there was some lower lumbar facet hypertrophy without obvious nerve root compression. (*Id.*). There was minimal prominence of the ventral canal, which was less apparent than on the prior exam from July 2, 2007. (*Id.*). An MRI was also taken of Plaintiff's thoracic region because of back pain, syrinx and paresthesia. (R. 315). The MRI revealed that the previously described lower dorsal syrinx is less apparent since January 21, 2006 and is unchanged since June 30, 2007. (*Id.*). There was no disc herniation or spinal stenosis. (*Id.*).

On October 26, 2010 and November 12, 2010, Plaintiff called Dr. DeGuzman reporting pelvic pain, frequency and burning with urination as well as bladder pain and pressure. (R. 404). Plaintiff requested antibiotics. (*Id.*).

On December 23, 2010, Plaintiff presented to a follow-up appointment with Dr. Sokos with constipation and insomnia. (R. 313). Plaintiff reported seeing a psychologist for depression and receiving chronic pain management. (*Id.*). Overall, Plaintiff's exam was normal with the exception of her psychological symptoms. (*Id.*).

On January 6, 2011, Plaintiff self-referred to Dr. Thomas Romano, M.D., Ph.D, who specializes in rheumatology and pain management. (R. 518). The record includes a letter written by Dr. Thomas Romano on January 10, 2011 regarding Plaintiff's medical history, a physical examination and his treatment plan. (R. 518-21). Dr. Romano reviewed Plaintiff's medical history as including musculoskeletal pain, tachycardia syndrome, endometriosis, vaginal pain for two years, migraine headaches and syringomyelia. (R. 518). Plaintiff reported that she has been house bound for the past three or four years, she has been on numerous medications for quite sometime, she is fairly miserable and the chronic pain is incapacitating. (*Id.*). In regard to medications, Dr. Romano noted that she had tapered off her steroids to a much lower dose and had tapered off her pain medications to a much lower dose than she ever has taken with bad results. (*Id.*). He stated,

13

"she is in so much pain and has responded by not being able to do anything because of pain, stiffness, fatigue. She had to quit her job as a RN about four years ago because of her health problems." (*Id.*). Plaintiff also reported difficulty with all aspects of activities of daily living, including difficulty walking, showering, dressing herself, getting in and out of bed, bending down, turning on faucets, and getting in and out of the car. (*Id.*). She states she is stiff in the morning for about ten hours. (*Id.*). She reported her pain at a nine to nine and a half out of ten. (R. 519). She reported pain above and below the waist on both sides of her body that she has had for many years. (*Id.*). She noted problems with memory and concentration, stated that she was easily distracted, has decreased libido, has chronic vaginal pain, gets extremely frustrated due to the inability to get relief from her symptoms and notes that she is unable to partake in her previous hobbies and activities or participate in social functions, including weddings or funerals. (*Id.*).

The physical examination conducted by Dr. Romano revealed slightly flat affect, decreased range of motion of the cervical spine in all directions with tautness of the neck and upper back/shoulder musculature. (*Id.*). Plaintiff reported pain on palpation of the bilateral occipital, low cervical, trapezius, supraspinatus, second rib, medial knee fat pad, glutens medius, greater femoral trochanteric and lateral humeral epicondylar areas (18 of 18 fibromyalgia tender points). (*Id.*). Plaintiff also had numerous myofascial bands and trigger points. (*Id.*). She had reticular skin discoloration of the legs with purplish discoloration of the knees and feet and coolness in these areas. (*Id.*). Deep tendon reflexes were one plus and equal bilaterally in both the upper and lower extremities. (*Id.*). She had decreased range of motion of both shoulders; she could only abduct the right shoulder 70 degrees and the left shoulder 71 degrees. (*Id.*). There was a one-inch difference in the thumb to shoulder blade test, with the left worse than the right. (*Id.*). Tissue compliance testing of the left quadratus lumborum was abnormal compared to the right. (*Id.*). There was no

true synovitis, nodules or rash. (*Id.*). No gross focal neurological findings. (*Id.*). Plaintiff had a positive straight leg raise bilaterally at about 45 degrees with a great deal of hamstring muscle tautness. (*Id.*). Cardiopulmonary exam fairly unremarkable with no lung sounds, wheezes or rubs. (*Id.*). The abdominal examination was also fairly unremarkable. (R. 520).

In summarizing Plaintiff's condition, Dr. Romano commented "[t]his patient is very complicated. She obviously has severe fibromyalgia and severe myofasical pain syndrome but there is significant perpetuating factors that need to be looked into." (*Id.*). Specifically, Dr. Romano recommended checking for adult growth hormone deficiency and DHEA deficiency. (*Id.*). Dr. Romano noted that he believes Plaintiff to be in sufficient pain to need opioids and that he did not know why Dr. Sharma decided to taper her off of opioids before. (*Id.*). Dr. Romano added, "I'm very concerned about her." (*Id.*). Dr. Romano prescribed 15 mg Oxycodone to be taken four times a day and recommended that Plaintiff improve her nutrition. (*Id.*). In concluding, Dr. Romano noted that Plaintiff meets not only the 1990 American College of Rheumatology criteria for fibromyalgia, but also the new criteria published in 2010. (*Id.*). Her WPI scale was 19 and her SS scale was 12. (*Id.*). He further noted "However, there is much more to this patient than just fibromyalgia and myofasical pain syndrome. She is very ill and has numerous medical problems. I'm much more concerned with her inability to do activities of daily living. Her universe is shrinking." (*Id.*).

Plaintiff had regular follow-up appointments with Dr. Romano on January 28, 2011 (R. 530), February 25, 2011(R. 529), March 25, 2011 (R. 528), April 22, 2011 (R. 527), May 20, 2011 (R. 526), June 17, 2011 (R. 525), June 29, 2011 (R. 502), July 15, 2011 (R. 524), August 12, 2011 (R. 523), September 9, 2011(R. 522) and October 5, 2011 (R. 588). Throughout these appointments, Plaintiff reported increased pain, intermittent sleep because of pain, anxiety,

fatigue, weight gain and needing help with activities of daily living. Plaintiff occasionally reported improvement in her conditions (R. 529) but continued to report pain and fatigue. Dr. Romano prescribed Plaintiff DHEA hormone supplements and a number of other medications, including Oxycodone. (*Id.*). On June 29, 2011, Dr. Romano requested that Plaintiff receive an MRI of her pituitary due to hypothyroidism with headaches, dizziness and abnormal weight gain. (R. 502). The MRI showed the pituitary to be normal in appearance and no pituitary lesion was identified. (*Id.*). He also referred her to an endocrinologist. (R. 524, 528).

Plaintiff also continued to see Dr. Aguirre, her treating psychiatrist throughout 2011. On March 2, 2011, Plaintiff presented to an appointment with Dr. Aguirre reporting a slight improvement in feelings of depression, with a decrease in tearfulness, but her intense tiredness and insomnia continue. (R. 474). On her May 3, 2011 appointment, however, Plaintiff reported a worsening of depressive symptoms. (R. 591). On July 6, 2011, Plaintiff reported low energy, depression and initial insomnia but noted a significant improvement in her functioning but continued difficulties concentrating. (R. 593). On October 5, 2011, Plaintiff reported feelings of low energy, multiple aches and pains, anxiety, insomnia and difficulties concentrating. (R. 593). Dr. Aguirre continued to manage Plaintiff's medication, which included Remeron, Ambien and Valium.

Plaintiff also saw two endocrinologists in 2011. On May 9, 2011, Dr. Hemlata Moturi, M.D., an endocrinologist, ordered a microsomal antibody laboratory test of Plaintiff's liver and kidney, a transglutaminase antibody test, a thyroglobulin test and a comprehensive metabolic panel. (R. 507, 509).

On July 19, 2011, Plaintiff had an appointment with Dr. Sean Nolan, an endocrinologist, for an initial hormone evaluation after being referred by Dr. Romano. (R. 498). The physician

noted Plaintiff's history of multiple medical problems, including chronic fatigue, and noted that she has seen multiple physicians, rheumatology, neurology and cardiology. (*Id.*). She reported tachycardia, sleep disturbances, chronic migraines, taking pain medication, that her hair has been falling out and gaining 70 pounds in the past six months. (R. 498-99). She reported forced sedentarism for five years due to syringomyelia, fibromyalgia, tachycardia and migraines. (R. 499). The physician noted her MRI's have been negative. (*Id.*). While the handwritten notes are not entirely clear, it appears the physician noted that the anemia is due to post-oral contraceptive withdrawal, that hypercortisolism induced the weight gain and the physician recommended weaning Plaintiff off of DHEA, or hormone supplements. (*Id.*). On August 16, 2011, Dr. Sean Nolan ordered additional laboratory tests. (R. 513, 514). On September 6, 2011, Dr. Nolan wrote Dr. Romano a letter explaining his findings and recommendations in moving forward in Plaintiff's case. (R. 534). Dr. Nolan commented that Plaintiff "presents a very difficult management situation." (*Id.*). He noted that her main current issue appears to be pelvic in origin and that she seems to have Endometriosis Syndrome based on her constant pelvic pain, severe vaginal discomfort, severe hot flashes and estrogen deficiency. (*Id.*). Dr. Nolan stated he would be highly in favor of a total hysterectomy with full estrogen replacement and recommended she be kept off DHEA until her pelvic situation is fully addressed by Dr. DeGuzman (*Id.*).

On July 18, 2011, Dr. Abhijit Kulkarni, M.D. with the Allegheny Center for Digestive Health wrote a letter to Dr. Sokos regarding his treatment of Plaintiff's ongoing upper abdominal pain syndrome. (R. 556-57). At this time, Plaintiff was presenting with symptoms including abdominal pain, bloating, early satiety, weight gain, constipation, hiccups, body aches and nausea. (R. 556). The letter is discussed in full below, but ultimately, Dr. Kulkarni recommended the performance of a laparoscopic cholecystectomy (i.e., removal of her gallbladder). (R. 557).

On October 20, 2011, Plaintiff had a six-month follow-up appointment with Dr. Edward K. Chiu, M.D., a cardiologist. (R. 536). Plaintiff's active problems at this time were hyperlipidemia, palpitations and sinus tachycardia. (*Id.*). Plaintiff reported aches and pains everywhere, that she has fibromyalgia and receives pain management by Dr. Romano. (*Id.*). She further stated that she is using a cane to get out of bed and has a chair at the commode to help her get off the toilet. (R. 540). She stated that her heart is always "flying" and she had to adjust her Metoprolol because her blood pressure was too low. (R. 536). She reported that her heart rate is flying just sitting and standing up and that her arms were stiff. (*Id.*). Dr. Chiu's diagnoses included sinus tachycardia, palpitations, atypical chest pain and hyperlipidemia. (R. 538). Dr. Chiu recommended that Plaintiff continue on her current medications, which included Ambien, cyanocobalamin/B12, DHEA, Oxycontin, Promethazine for nausea, Remeron, Toprol and Valium. (R. 538-39). Dr. Chiu discussed with Plaintiff the fact that no cardiac disease was identified, that she could continue taking Metoprolol as needed for tachycardia and discussed a possible evaluation for a metabolic disorder but that he would defer to Dr. Sokos. (R. 539).

Plaintiff continued to have regular appointments with Dr. Romano on November 2, 2011 (R. 586), November 29, 2011 (R. 584), December 30, 2011 (R. 582), January 25, 2012 (R. 580), February 22, 2012 (R. 578), March 21, 2012 (R. 576), April 18, 2012 (R. 574), May 9, 2012 (R. 572), May 16, 2012 (R. 570), June 11, 2012 (R. 568) and July 9, 2012 (R. 567). Throughout these appointments, Plaintiff reported pain, needing help with her activities of daily living, sweating, weight gain, bladder problems and problems with fatigue and having almost no stamina. Dr. Romano continued Plaintiff on her medications, recommended that Plaintiff continue to follow-up with specialists as needed and noted that Plaintiff should not perform work.

Throughout 2012 Plaintiff continued to see Dr. Aguirre, her treating psychiatrist. On

January 9, 2012, Plaintiff reported worrying, depression, low energy, fatigue and poor sleep. (R. 592). On April 11, 2012, Plaintiff reported some anxiety and worrying. (R. 590). She noted that the medication "has been helpful to some extent in decreasing her intense hopelessness" and "helping with her anxiety and her panic attacks have decreased in frequency." (*Id.*). Plaintiff still reported experiencing significant feelings of low energy, anhedonia and difficulties with functioning. (*Id.*). She gets tired easily and needs much assistance with activities of daily living. (*Id.*). On June 30, 2012, Plaintiff reported recurring feelings of depression and concern about her medical conditions, which include a gallbladder surgery and a liver biopsy that showed fatty changes. (R. 589). She denied suicidal ideation. (*Id.*). During these appointments, Dr. Aguirre reviewed medication issues with Plaintiff and continued to prescribed Ambien, Valium and Remeron.

Starting in 2012, Plaintiff also began reporting bladder problems, which required her to see a number of specialists and undergo various tests and procedures. On January 23, 2012, Plaintiff reported bladder issues, including urinary urgency and suprapubic pain, to her primary care physician, Dr. Sokos. (R. 596). Dr. Sokos diagnosed Plaintiff with thyroid dysfunction/nodule and bladder spasms. (*Id.*). He recommended blood work and a referral to a specialist for her bladder problems. (*Id.*). On February 3, 2012, Plaintiff had a bilateral renal ultrasound. (R. 549). The ultrasound revealed normal appearing kidneys except for a 9 mm x 5mm area of increased echogenicity to the lateral cortex of the mid pole of the right kidney, which could represent a lipomatous lesion or calcification. (*Id.*). On February 10, 2012, Plaintiff reviewed her recent laboratory results with Dr. Sokos, who maintained Plaintiff's fibromyalgia diagnosis and recommended that Plaintiff see a specialist. (R. 595).

Plaintiff presented for appointments at Family Urology on March 8, 2012 (R. 542), March 31, 2012 (R. 543) and April 24, 2012 (R. 541). During these appointments, Plaintiff reported

frequent bladder spasms, urinary pain and pelvic pressure/pain. Her physical examination revealed normal findings in other areas and Plaintiff was assessed as having frequent difficulty urinating and pelvic pain. Plaintiff was given a prescription and several tests were ordered. (*Id.*). Plaintiff was given a prescription for her pelvic and bladder pain and a consult with WVU was eventually ordered in April.

On March 14, 2012, Plaintiff had a CT of her abdomen due to urinary urgency, suprapubic pain, abnormal liver enzymes, right renal mass and blood in her urine. (R. 548). The study was compared to a prior exam on January 11, 2008. (*Id.*). The kidneys showed no renal calcifications, bilateral function was demonstrated after contrast, no hydronephrosis was noted, no focal renal abnormalities were noted. (*Id.*). Non-urinary findings showed fatty replaced liver with some focal bilateral pleural plaque and focal infiltrate on the left that is new from 2008. (*Id.*). There were a few small periaortic nodes seen, nonspecific but more prominent than the prior study but still likely not significant. (*Id.*). The gallbladder was mildly distended without gallstones. (*Id.*). The common duct is prominent measuring almost 13 mm in size at the ampulla, which was of questionable significance but no obvious etiology was noted. (*Id.*). The impression of the CT was negative for kidneys but did reveal fatty replaced liver and prominent common duct. (*Id.*).

On March 19, 2012, Plaintiff presented to an appointment with Dr. Abhijit Kulkarni for her continuing abdominal pain and esophageal reflux, hypercholesterolemia, metabolic tests of nonspecific elevation of transaminase levels, cholelithiasis, fibromyalgia, and thyroid nodule. (R. 553). The physical examination showed Plaintiff in no acute distress. (*Id.*). Her abdomen was non-distended, soft, tender, not firm, not rigid, no rebound and no guarding. (*Id.*). Bowel sounds were present. (*Id.*). There was tenderness in the epigastric area and in the right upper quadrant. (*Id.*). Dr. Kalkarni's assessment was abdominal pain in the central upper belly (epigastric),

abdominal pain in the right upper belly (ruq), cholelithiasis (i.e., gallstones), esophageal reflux, and metabolic tests of nonspecific elevation of transaminase levels. (R. 554). Dr. Kulkarni noted that Plaintiff's transaminases level were about one half times the upper limit of normal. (R. 555). He suspected that her abnormal levels were related to a non-alcoholic fatty liver disease. (*Id.*). The plan moving forward was an endoscopy, abdominal ultrasound and additional laboratory tests, blood work and hepatitis serologies. (R. 554).

On March 28, 2012, Dr. Kulkarni performed an ultrasound of Plaintiff's abdomen due to abdominal pain and cholelithiasis. (R. 560). The ultrasound revealed diffuse fatty infiltration of the liver. (*Id.*). Her gallbladder was well distended with at least three or more calcified gallstones in the dependent aspect, measuring less than 1 cm in diameter each. (*Id.*). Her kidneys were normal in size and shape. (*Id.*). The spleen was normal as well. (*Id.*). Dr. Kulkarni's impression was cholelithiasis and he noted to make a referral to Dr. Raves because fatty liver is likely causing LFTs. (*Id.*).

On April 3, 2012, Plaintiff underwent a cystoscopy and hydrodistention procedure by Dr. Walter Taubenslag, M.D. (R. 546). No papillary lesions were noted in the bladder, no glomerulations or ulcers were noted. (*Id.*). Plaintiff tolerated the procedure well. (*Id.*). The post-operative diagnosis was urgency, dysuria, rule out interstitial cystitis. (*Id.*).

On April 30, 2012, Plaintiff underwent a CT of her pelvic due to urinary frequency and urgency and suprapubic pain. (R. 547). No calculi were identified within the bladder, the urinary bladder was mildly to moderately distended with no obvious bladder wall mass. (*Id.*). There was no dominant pelvic mass, the uterus and adnexual structures were unremarkable and the visualized portions of the bowel appeared to be within normal limits. (*Id.*). There was no pelvic lymphadenopathy. (*Id.*). There were no findings of the CT to explain the urinary frequency,

urgency and suprapubic pain. (*Id*.).

On May 3, 2012, Plaintiff underwent an endoscopy of her esophagus by Dr. Abhijit Kulkarni, M.D. due to abnormal distress and pain. (R. 558). Plaintiff tolerated the procedure well and there were no complications. (*Id*.). The small bowel biopsy revealed benign small bowel mucosa with well preserved villous architecture. (R. 561). The gastric biopsy revealed benign gastric mucosa and the immunohistochemistry study was negative for h. pylori, a bacteria. (*Id*.).

On May 18, 2012, Plaintiff had an appointment with Dr. John J. Raves, M.D. after being referred by Dr. Kulkarni for cholelithiasis. (R. 604). Dr. Raves noted that Plaintiff has "a whole host of problems relating to abdominal pain and distention for the past four years." (*Id*.). He noted that she has a history of elevated liver enzymes, which may be medication related. (*Id*.). She has a history of endometriosis with a previous pelvic laparoscopy for endometriosis about five years ago. (*Id*.). He noted that previous CT scans did not show stones, but ultrasonography shows the stones in her gallbladder. (*Id*.). Her liver is fatty. (*Id*.). On physical examination, she was anicteric, her abdomen was soft and mildly obese, there was no significant tenderness and the gallbladder was not palpable, nor tender. (*Id*.). Dr. Raves concluded: "it is going to be impossible to tell whether Kathy's cholelithiasis is symptomatic, but it is probably a good idea to consider taking the gallbladder out of the equation because of all her chronic complaints and pain." (*Id*.). He recommended conducting a laparoscopic cholecystectomy and liver biopsy. (*Id*.).

On June 13, 2012, Dr. John J. Raves, M.D. conducted a laparoscopic cholecystectomy and liver biopsy on Plaintiff due to symptomatic cholelithiasis and abnormal liver function tests. (R. 600). During the procedure, Dr. Raves noted that the liver appeared relatively normal but slightly fatty. (*Id*.). The gallbladder was removed and liver biopsy performed without complications. (*Id*.). Plaintiff was kept overnight. (R. 598).

On June 18, 2012, Dr. John Raves, M.D. wrote a letter to Dr. Sokos, Dr. Kulkarni and Dr. Romano regarding the laparoscopic cholecystectomy and liver biopsy. (R. 598). Her only post-surgical complication was constipation, which Dr. Raves attributed to her narcotic usage. (*Id.*). He reported that the pathology on the gallbladder showed cholelithiasis and chronic cholecystitis. (*Id.*). The liver biopsy showed marked and severe steatosis of the liver. (*Id.*). Upon her examination, Plaintiff's abdomen was soft and completely non-tender, the laparoscopic incisions were healed nicely. (*Id.*). Dr. Raves noted that "From my standpoint, Kathy can resume normal activities and has no restrictions. Other than her just taking care of the constipation, I did tell her that she really needs to work on getting her weight down and trying to reverse that severe steatosis." (*Id.*).

On June 30, 2012, Plaintiff underwent additional laboratory testing as ordered by Dr. Romano and Dr. Kulkarni. (R. 562, 563, 564, 565, 566). The record contains regular treatment notes with Dr. Romano through July 9, 2012. (R. 567).

### 3. Medical Opinions and Reports

#### a. Mental Residual Functional Capacity – Dr. Alfredo Aguirre, September 1, 2009

Dr. Aguirre, Plaintiff's treating psychiatrist, completed a Mental Residual Functional Capacity Assessment on September 1, 2009. (R. 606-09). Dr. Aguirre noted two marked and two moderate limitations in Plaintiff's social functioning. (R. 606-07). He noted four marked limitations in Plaintiff's ability to sustain concentration and persistence and noted an extreme limitation in Plaintiff's ability to perform at production levels expected by most employees. (R. 607). In regard to adaptation, Dr. Aguirre noted three moderate limitations, two marked limitations and an extreme limitation in Plaintiff's ability to tolerate customary work pressures. (R. 608). Dr.

Aguirre noted that Plaintiff's condition would be likely to deteriorate if she was placed under stress, particularly that of a job. (*Id.*). He noted that the impairment has lasted or is expected to last twelve months or more. (R. 609). He also marked that alcoholism and/or drug addiction was not a confirmed diagnosis at this time. (*Id.*).

### b. WV Disability Determination Service Physical Examination - Dr. Gabriel Sella – January 18, 2011

On January 18, 2011, Dr. Gabriel Sella, M.D. conducted a history and physical examination of Plaintiff for the West Virginia Disability Determination Service. (R. 453-58). Plaintiff's medication at this time included: cyanocobalamin, promethazine, Ambien, Toprol, Valium, Oxycodone, Remeron and Trivora-28. (R. 453). Plaintiff tends to place above 15 to 20 percent more weight on the left lower extremity. (*Id.*). Her grip testing was below normal limits at the five positions of dynamometer, nonphysiologic pattern and strength. (*Id.*). Her psychiatric evaluation showed normal judgment and insight, normal orientation and memory and that "she is quite depressed and shows moderate anxiety." (R. 454). Her neck showed normal range of motion. (*Id.*). She showed normal sensory and reflexes but decreased motor. (*Id.*). Rhomberg and tandem walk were negative, toe walking and heel walking were negative, squatting and hoping negative and straight leg raise was negative. (*Id.*).With regard to her musculoskeletal/joints examination, Dr. Sella noted "testing especially with the regard to the fibromyalgia diagnosis shows that she has bilateral tender points on the upper trapezius and quadratus lumborum. She has nonspecific probable hyperalgesia on most of her trunk including the hips and complains of generalized weakness and difficulty with daily activities." (R. 455).

Dr. Sella noted that Plaintiff presented with "depression, anxiety, insomnia, fatigue, fibromyalgia, chronic fatigue, syringomyelia, neuropathy, Chiara malformation, migraines,

endometriosis and heart condition," which refers to tachycardia. (R. 455). Dr. Sella explained that Plaintiff was found to be tachycardiac at the office and that Plaintiff is taking the appropriate medication with moderately good response. (*Id.*). The endometriosis was discovered about four years ago and Plaintiff is on appropriate medication with moderately good response. (*Id.*). As for the syringomyelia, neuropathy and Chiari malformation, Dr. Sella noted they are "possibilities or probabilities, but not certainties from the documentation that I have seen" but she noted "it is unlikely that I have all of the documentation." (*Id.*). Dr. Sella further stated that "the other symptoms, depression, anxiety, insomnia, fatigue, fibromyalgia and chronic fatigue, they are all discussed under the topic of fibromyalgia" (*Id.*). Dr. Sella explained that Plaintiff received this diagnosis four years ago and received treatment from a local rheumatologist. (*Id.*). Dr. Sella noted:

> All the symptoms that she is describing could be ascribed to the fibromyalgia or could be ascribed to the other conditions, which are not investigated or treated and definitely not documented on the chart. In terms of tender points today, I found only four definite tender points so it is 4 out of the 18 that one needs to define the condition or at least 4 out of the 11 that would define the condition on a clinical basis.

(*Id.*). Dr. Sella further concluded, "[i]t is highly likely that she has this condition from the description of chronic fatigue, anxiety, insomnia, and depression as well as the chronic pain that she is complaint of, she is entirely credible." (*Id.*).

In terms of work related ability, Dr. Sella concluded that "she can sit without restrictions, stand and walk without restrictions when the fatigue does not stop her from doing so, lift and carry light weights, on occasion handle light objects, hear, speak and travel. Her main problem is that of extreme fatigue and pain related probably to fibromyalgia." (*Id.*). Dr. Sella recommended further investigation of Plaintiff's conditions. (R. 456).

### c.  Physical Residual Functional Capacity Assessment, January 30, 2011

Plaintiff underwent a physical residual functional capacity assessment by a medical consultant on January 30, 2011. (R. 466-73). The assessment found Plaintiff capable of occasionally lifting 20 pounds, frequently lifting 10 pounds, standing and/or walking for at least two hours in an eight-hour workday, sitting for a total of about six hours in an eight-hour workday, and unlimited pushing and/or pulling. (R. 467). Plaintiff was found to have occasional postural limitations for climbing, stooping, kneeling, crouching, crawling and was limited to never balancing. (R. 468). There were no manipulative, visual or communicative limitations found. (*Id.*). For environmental limitations, Plaintiff was limited to avoiding concentrated exposure to extreme cold and heat and to fumes, odors, dusts, gases and poorly ventilated areas, and as limited to avoid even moderate exposure to hazards, such as machinery or heights. (R. 470). As for her symptoms, the assessment found that Plaintiff is partially credibly and that her subjective symptoms do not correlate with the objective data. (R. 471).

Dr. Curtis Withrow, M.D., who has a specialty in Neurology, reviewed this assessment and the evidence in the file and he affirmed the assessment as written on May 5, 2011. (R. 497).

### d.  Ms. Aileen Mansuetto, M.A., Disability Determination Examination – Mental Health, February 13, 2011

Plaintiff appeared for a disability determination examination on February 13, 2011, which was conducted by Ms. Aileen Mansuetto, M.A. (R. 459). Plaintiff stated that she was applying for benefits due to depression, anxiety, insomnia and fatigue. (*Id.*). Her diagnoses included "fibromyalgia, chronic fatigue syndrome, syringomyelia, neuropathy, Chiari malformation, migraines, endometriosis, and a heart condition." (*Id.*). Plaintiff also reported that her hair is falling out, she has tachycardia, gallstones, endometriosis, that she is "constantly worried and

anxious," she "went from complete functioning to nothing" and she has pain in her back, neck, hands and feet, and complains of being dizzy, lightheaded, feeling weak, and experiencing abdominal pain, constipation and nausea." (*Id.*).

Plaintiff's reported symptoms, which include lacking motivation to participate in social or family events, lacking energy to complete tasks, staying in bed almost all day, having sleep disturbance limited to one to two hours of sleep a night, having a poor appetite, crying episodes due to her ill health and experiencing panic episodes for which she visited the emergency room about ten or eleven times. (R. 460). Plaintiff showed no symptoms of phobias, obsessions, compulsions or PTSD. (*Id.*).

Ms. Mansuetto referenced a May 1, 2008 mental status examination conducted by Holly Coville, who found that Plaintiff has "chronic fatigue syndrome, fibromyalgia, feelings of confusion, and cognitive processing problems. She has difficulties reading, conversing, articulating her words and short term memory problems." (R. 461). Ms. Coville's diagnosis was "Adjustment Disorder, with Anxiety and Depressed Mood, Chronic." (*Id.*).

As for mental health treatment, Plaintiff received inpatient treatment for four days at Hillcrest Hospital in December 2009 with a discharge diagnosis of anxiety and psychotropic medications including Remeron, Ambien and Valium. (R. 461). She started outpatient treatment in 2011 with Barbara Rush and started outpatient therapy with Nancy Georges in 2010 but she only had one visit with each therapist. (*Id.*).

Ms. Mansuetto conducted a mental status examination. (R. 462). Plaintiff's attitude was polite but grim; her speech coherent but monotone; orientation was good; mood was flat and depressed; affect flat and blunted; concentration, though content, perception were within normal limits; her insight was poor; psychomotor activity decreased based on observation; judgment

27

within normal limits based on response to judgment scenarios; Plaintiff denied suicidal ideation; immediate memory and remote memory were within normal limits but recent memory was moderately deficient; persistence and pace were within normal limits; social functioning was deficient as she answered questioned but was very flat in her interactions, made poor eye contact and was lethargic and despondent. (R. 462-63).

Plaintiff's Axis I diagnostic impressions were 1) panic disorder, without agoraphobia and 2) adjustment disorder, with anxiety and depressed mood, chronic, by history, no Axis II diagnosis and Axis III diagnosis of fibromyalgia, chronic fatigue, syringomyelia, neuropathy, Chiari malformation, migraines, endometriosis, and heart condition (self-reported). (R. 463). Ms. Mansuetto concluded that

> [she] is reporting symptoms of depression and anxiety that have been present for the last several years. These symptoms include appetite and sleep problems, anhedonia, and libido problems. She also feels hopeless, helpless and worthless, and is in a down mood when she is not feeling fretful, irritable and anxious. She experiences panic episodes several times a month.

(*Id.*). Ms. Mansuetto noted that a diagnosis of somatization disorder was considered due to Plaintiff's reports of various medical diagnoses. (*Id.*). Ms. Mansuetto stated that if documentation supported the medical diagnoses, then reconsideration of rendering the somatization disorder diagnosis could occur. (*Id.*).

Ms. Mansuetto found that Plaintiff's prognosis was "guarded." (*Id.*). She stated that Plaintiff's "health has not improved in the past several years" and recommended the Plaintiff engage in outpatient psychotherapy. (*Id.*). She noted that Plaintiff needs assistance from her husband to shower and shave and that she is unable to care for her husband, home or cats. (*Id.*). She further noted that Plaintiff reported no social activities. (*Id.*). She found that Plaintiff was capable of managing her own finances if granted benefits. (*Id.*).

### e. Mental Residual Functional Capacity Assessment & Psychiatric Review Technique – Dr. Jeff Boggess, PhD, March 3, 2011

Dr. Jeff Boggess conducted both a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique on March 3, 2011. (R. 476-93). The Assessment found no significant limitations in Plaintiff's understanding, memory, sustained concentration and persistence. (R. 477). Moderate limitations were noted for Plaintiff's ability to interact appropriately with the general public and ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*). No other significant limitations were noted for Plaintiff's social interaction or adaption abilities. (*Id.*). The reviewer found that Plaintiff needs her husband's help to shower, that she only occasionally cooks, uses the computer to shop and talks on the phone. (R. 478). She can count change and handle bank accounts and can pay attention for about a half an hour. (*Id.*). The reviewer found that Plaintiff "retains the ability for work activity with limited contact with the general public. (*Id.*).

The Psychiatric Review Technique assessed Plaintiff as having an Affective Disorder (12.04) for disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by the presence of an adjustment disorder. (R. 483). Plaintiff was also assessed as having an Anxiety-Related Disorder (12.06) based on a panic disorder or anxiety, not otherwise specified. (R. 485). Third, Plaintiff was assessed as having Somatoform Disorder (12.07) due to the presence of physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms. (R. 486). As for the "B-Criteria" of the listings, Plaintiff was assessed as only having moderate difficulties in maintaining social functioning and mild restrictions of activities of daily living. (R. 490).

The consultant's notes provide an overview of the records reviewed in preparing the

reports. (R. 492). Dr. Boggess noted evidence of benzodiazepine dependence and/or drug seeking behavior in the record. (*Id.*). He noted no treatment evidence since September 2010 in the file. (*Id.*). In regard to the 2009 ALJ decision, Dr. Boggess stated "there is new and significant psych evidence since this decision including new dx and objective MSE's. The 09 decision is no longer given controlling weight due to these additions." (*Id.*). Further, Dr. Boggess found that Plaintiff "appears only partially credible as per allegations." (*Id.*).

This report and all of the evidence in the file was reviewed by Dr. Frank Roman, Ed.D., who has a specialty in psychology, and he affirmed this assessment as written on May 2, 2011. (R. 496).

### f. Physical Capacity Evaluation – Dr. Thomas Romano, M.D., Ph.D., April 1, 2011

Dr. Thomas Romano, one of Plaintiff's treating physicians, completed a Physical Capacity Evaluation form on April 1, 2011. (R. 495-95). Dr. Romano noted that in an eight-hour work day, Plaintiff could stand for two hours, walk for one hour, sit for three hours, can occasionally lift/carry a maximum of less than ten pounds and cannot do any frequent lifting or carrying. (R. 494). Plaintiff can use her hands for repetitive simple grasping and handling and fine manipulation and fingering and cannot push or pull. (R. 495). Dr. Romano noted that these hand abilities varies and that some days she can do some tasks and other days she cannot. (*Id.*). Plaintiff cannot use her feet for repetitive movements such as operating foot controls due to fatigue and decreased stamina. (*Id.*). Plaintiff can never crawl or climb ladders but can occasionally bend, kneel, squat and climb stairs. (*Id.*). Plaintiff can reach above shoulder level but cannot do such tasks on command or repetitively. (*Id.*). In conclusion, Dr. Romano concluded: "This patient has a medical condition whose symptoms vary from day to day and where fatigue and decreased stamina are key

symptoms. The patient cannot work due to her inability to perform tasks on demand and perform repetitive muscular activities." (*Id.*).

### a. Letter from Dr. Abhijit Kulkarni, M.D., July 18, 2011

Dr. Abhijit Kulkarni, M.D. with the Allegheny Center for Digestive Health wrote a letter to Dr. Sokos regarding Plaintiff's ongoing upper abdominal pain syndrome on July 18, 2011. (R. 556-57). Plaintiff first visited Dr. Kulkarni three years ago for the possibly of an SMA syndrome, which had been discounted. (*Id.*). She then presented again in March 2011 for upper abdominal discomfort with associated symptoms including bloating, constipation, early satiety, hiccups, boy aches, and nausea. (*Id.*). Dr. Kulkarni reviewed Plaintiff's ultrasound completed in 2010 and confirmed the presence of cholelithiasis (gallstones) along with tenderness over the gallbladder on ultrasonography. (*Id.*). The physical examination showed Plaintiff in no acute distress and no additional abnormal findings. (*Id.*).

Dr. Kulkarni opined that Plaintiff "has a variety of different gastrointestinal symptoms, many of which I believe may be functional, possibly related to underlying chronic constipation which we have had some difficulty at getting under control. (R. 556-57). Dr. Kulkarni noted that medication therapy had been somewhat unsuccessful in relieving her symptoms. (R. 557). An x-ray showed no significant amount of stool buildup in the colon without obstructive etiology and a colonoscopy failed to show any evidence of mechanical obstruction. (*Id.*). Dr. Kulkarni further found that Plaintiff has "upper quadrant discomfort with gallstones on ultrasonography" and noted that "certainly we may be dealing with a symptomatic gallbladder disease that is one of her many issues." (*Id.*). In addition, recent blood work failed to show evidence of celiac disease and demonstrated normal liver function tests, amylase and lipase. (*Id.*).

In moving forward, Dr. Kulkarni recommended the performance of a laparoscopic

cholecystectomy due to her persistent upper abdominal pain and lack of other obvious explanations. (*Id.*). Plaintiff discussed the risks and benefits and stated she wished to proceed with the procedure so Dr. Kulkarni noted he would make the necessary referral to Dr. John Raves for his opinion. (*Id.*). He also rescheduled an upper endoscopy to reevaulate her upper abdominal pain and to exclude other possible causes. (*Id.*).

### b. Physical Capacity Evaluation – Dr. Thomas Romano, September 2, 2011

Dr. Romano completed a second Physical Capacity Evaluation on September 2, 2011. (R. 516-17). Dr. Romano noted that in an eight-hour workday, Plaintiff can stand for one hour, walk for one hour, sit for two hours, she can occasionally lift or carry less than ten pounds and she is not able to frequently lift or carry any weight without severe pain. (R. 515). In regard to the repetitive use of her hands, Dr. Romano noted that she can perform simple grasping and handling, pushing and pulling and fine manipulation and fingering but that she can only do these tasks with frequent breaks and not often. (R. 516). Plaintiff cannot use her feet for repetitive movements. (*Id.*). She can never squat, crawl or climb ladders and can only occasionally bend, kneel and climb stairs. (*Id.*). Plaintiff is able to reach about shoulder level but not reliably or repetitively. (*Id.*).

### c. Remarks from Dr. Thomas Romano, September 2, 2011

The record also included a letter from Dr. Romano dated September 2, 2011 that discussing Plaintiff's medical history and conditions. (R. 517). He states that he first started seeing Plaintiff on January 6, 2011 and he diagnosed her with "severe fibromyalgia, severe myofascial pain syndrome and eventually found out that she is also deficient in two hormones, namely DHEA and growth hormone." (*Id.*). He further noted that she has endocrine problems, which are being treated by Dr. Sean Nolan, an endocrinologist, and her family doctor. (*Id.*).

Dr. Romano describes fibromyalgia generally and stated that "many of the tools used to

32

evaluate impairment with regards to disability such as functional capacity evaluations are not really applicable in patients with fibromyalgia because patients with fibromyalgia may be able to do a task a few times, but cannot do it many times during the course of the day and cannot necessarily do it on demand. (*Id.*).

Dr. Romano further discusses Plaintiff's symptoms as including difficulty thinking, depression, anxiety, difficulty performing activities of daily living, difficulty walking out doors on flat ground, much difficulty washing and drying her body as well as dressing herself, difficulty getting in and out of bed, bending down to pick up clothing from the floor, turning regular faucets on and off and getting in and out of the car. (*Id.*). He explains that Plaintiff is stiff when she wakes up in the morning and often wakes up as tired as when she went to bed. (*Id.*). He further states that "because she also has myofascial pain syndrome her muscles can become very tight and cause decreased range of motion of joints such as shoulders, cervical spine, etc." (*Id.*).

In addition to these conditions she has endocrine problems and reports a great deal of fatigue, which she rated at a ten out of a ten. (*Id.*). Due to this fatigue, Dr. Romano conducted blood tests, which revealed low levels of DHEA for age and low levels of IGF-1 (Insulin Dependent Growth factor one, otherwise known as Somatomedicin C) for age, which suggested "that she suffers from adult growth hormone deficiency." (R. 612). Dr. Romano noted that Plaintiff was seeing an endocrinologist to look into this further. (*Id.*). Dr. Romano concluded:

> because of severe musculoskeletal pain, because of severe fatigue and because of difficulty with memory, concentration and mood, it is my professional opinion that this patient is unable at this time to engage in any type of employment. At this juncture I would state that this condition is likely to last at least 12 months. Thus, it is my professional opinion, that Kathy McIntire…should be considered 100% permanently and totally disabled due to the above impairments and due to her medical problems outlined above.

(R. 612).

### d. Letter to Dr. Romano from Dr. Sean Nolan, M.D., September 6, 2011

Dr. Sean Nolan wrote a letter to Dr. Romano after he referred Plaintiff to Dr. Nolan for an endocrinology assessment. (R. 534-35). Dr. Nolan reviewed Plaintiff's history: that she was forced to stop working in 2006 because of multiple symptoms symptomatology, she has profound fatigue, she has become withdrawn and isolated, she has a rapid heart rate and pulse, she has gained 70 pounds in the past six months, she has orthostatic blood pressure and pulse changes, she has migraines, fibromyalgia, tachycardia, hypothyroidism, constant sweating, hair loss, menstrual dysfunction, she has had amenorrhea during the past number of months, she has intolerable hot flashes, she has sleep disturbance despite being prescribed Valium, Ambien and Remeron by a psychiatrist. (R. 534). Dr Nolan stated: "Various tests have been run without significant substantial diagnostic conclusions." (*Id.*).

Dr. Nolan stated that Plaintiff was seen by Dr. Moturi, an endocrinologist, who found her thyroid function to be normal except for a subnormal free T4 for which she was placed on Synthroid medication. (*Id.*). Various pituitary tests were done and an MRI completed both of which were normal. (*Id.*). An IFG-1 level was slightly low and Dr. Moturi advised Plaintiff to stop taking her oral contraceptive medication. (*Id.*).

In assessing Plaintiff's condition, Dr. Nolan reported that "she has become overwhelmed by the number of symptoms and their negative influence on her quality of life." (*Id.*). Dr. Nolan explains that Plaintiff has had severe hot flashes for three to four years, she sweats constantly, she lies in bed all day, she has become depressed, she has severe constipation, she has GERD, she has IBS, her gallbladder is diseased, her hair is thinning, she is severely weak and fatigued, she has become hermetic and does not leave her home, she has tachycardia on very minimal exertion. (*Id.*).

Plaintiff's physical examination revealed blood pressure of 108/68, regular pulse, she

34

appeared clinically euythyroid, her hair was thinning without balding, carotid pulses were present and equal without bruits. (R. 535). Her cardiovascular examination was unremarkable, abdomen normal, no neurological deficits and no signs of any specific joint problems. (*Id.*)

Dr. Nolan commented that Plaintiff "presents a very difficult management situation." (*Id.*). He noted that her main current issue appears to be pelvic in origin and that she seems to have Endometriosis Syndrome based on her constant pelvic pain, severe vaginal discomfort, severe hot flashes and estrogen deficiency. (*Id.*). Dr. Nolan stated he would be highly in favor of a total hysterectomy with full estrogen replacement and recommended she be kept off DHEA until her pelvic situation is fully addressed by Dr. DeGuzman (*Id.*). He stated that he does not believe that growth hormone deficiency is playing a central role and that she does not warrant detailed Growth Hormone testing and she would not be eligible for Growth Hormone treatment. (*Id.*).

### e. Case Analysis - Sandra Peralta, March 21, 2012

Sandra Peralta conducted a SSA case analysis on March 21, 2012. (R. 531-33). The sources reviewed included records from July 19, 2011 from Dr. Nolan and records from Dr. Romano. (*Id.*). Ms. Peralta discussed the evidence and issues involved in Plaintiff's case and found that Plaintiff needs help showering, is able to occasionally cook, and that she "retains the capacity for work activity with limited contact with the general public." (*Id.*). In a mental status exam, Plaintiff showed normal judgment and insight and normal memory to recent and remote events. (*Id.*). Plaintiff has difficulties reading, conversing, articulating her words and short-term memory problems and she makes poor eye contact. (*Id.*). As for physical findings, "there is evidence indicating the claimant has a history of tenderness at the lowest asect [sic] of lumbar spine but not in the upper lumbar region. All ROM was normal, grip testing was also normal." (*Id.*).

In regard to functional information, Ms. Peralta noted that Plaintiff reports her conditions

cause "constant pain, anxiety, depression, insomnia and therefore causes inability to think straight." (R. 532). Plaintiff reported not being able to stay in an upright position for very long and that she stays in bed all day. (*Id.*). Ms. Peralta stated that Plaintiff indicates she takes care of her two cats, that her husband and mother do all of the cooking and cleaning, she rarely goes outside and she only shops online. (*Id.*). She reports sleeping problems and states that she has no REM sleep. (*Id.*). Plaintiff further stated that she has problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions and using her hands. (*Id.*).

In regard to objective findings, Ms. Peralta found that Plaintiff was "first seen" January 6, 2011 and that her diagnoses included fibromyalgia, severe myofascial pain syndrome, two deficient hormones and endocrine problems. (*Id.*). She reports her activities of daily living have been adversely affected as she has difficulty walking outdoors on flat ground, washing and drying herself, dressing, getting in and out of bed and picking up clothes from the ground. (*Id.*). Her RFC was light work with standing/walking for two hours and sitting for six hours. (*Id.*). There were postural and environmental limitations as well.

Ms. Peralta's recommendation stated that Plaintiff would need to meet or equal a listing to be fully favorable. (*Id.*). Ms. Peralta concluded "The evidence in the file does not support meeting or equaling any listing. A fully favorable award is not possible given the current file. An ND decision is applicable." (*Id.*).

### f.  Mental Residual Functional Capacity – Dr. Alfredo Aguirre, September 5, 2012 (Regarding Plaintiff's Condition as of or before 12/31/2011)

Dr. Aguirre, Plaintiff's treating psychiatrist, completed a second Mental Residual Functional Capacity assessment on September 5, 2012 regarding Plaintiff's condition as of or

before December 31, 2011. (R. 613-16). Dr. Aguirre noted two moderate limitations and two marked limitations in Plaintiffs social functioning. (R. 613-14). He noted marked limitations in Plaintiff's ability to sustain concentration and persistence and an extreme limitation in Plaintiff's ability to perform at production levels expected by most employees. (*Id.*). He noted three moderate and three marked limitations in Plaintiff's adaptation abilities in a work environment. (R. 615). He noted that Plaintiff's condition is likely to deteriorate if she is placed under stress, particularly that of a job. (*Id.*). He further marked that the impairment has lasted or is expected to last twelve months or more. (R. 616). Dr. Aguirre also noted that Plaintiff does not have alcoholism or drug addiction as confirmed diagnosis. (*Id.*).

### g.   Letter from Dr. Alfredo Aguirre to Appeals Council, September 19, 2012

Dr. Aguirre explains that he has treated Plaintiff since July 2009 and that she presented with multiple symptoms, including feelings of depression and hopelessness, anxiety, insomnia, fatigue, difficulties concentrating and sustaining effort in addition to physical symptoms including fatigue, dizziness, lightheadedness, weakness, multiple aches and pains and general loss of strength. (R. 617). Dr. Aguirre notes that Plaintiff was under his care on the adult psychiatric unit when she was hospitalized in the Ohio Valley Medical Center in December 2009. (*Id.*). At this time, her diagnosis was depression and some somatoform disorder. (*Id.*). She also suffered from migraine headaches, chronic fatigue, chronic abdominal and back pain and syringomyelia of the lumbar spine. (*Id.*).

Her medications prescribed by Dr. Aguirre include Remeron, Ambien, Valium. (*Id.*). He noted that she responded poorly to a variety of anti-depressants. (*Id.*). In December 2009, he added a small dose of Diazepam for treatment of anxiety, difficulties relaxing and sleep problems. (*Id.*).

Over the past year, Dr. Aguirre stated that Plaintiff has shown a "significant degree of

somatic preoccupations with her symptoms of fatigue, tiredness and significant sleep disturbance. She had been seen in specialized consultation for sleep disorder." (*Id.*). He concluded that Plaintiff:

> shows some impairment in social interactions, mainly difficulties working in coordination with others and difficulties with communication. She also has significant impairments in the area of sustained concentration and persistence. Her anxiety and fatigue caused a significant impairment in her ability to maintain attention and concentration for more than brief periods of time. She has serious impairments in coping and dealing with stress, I think the patient's impairments would not allow her to work. Furthermore, I think that her condition is likely to deteriorate if she's placed under the stress of work.

(R. 618). While the ALJ's decision is dated September 17, 2012, and Dr. Aguirre's letter is dated November 19, 2012, the majority of this letter appears to deal with Dr. Aguirre's treatment and diagnosis of Plaintiff prior to this date and thus appears to be properly incorporated into the record by the Appeals Council.

### D.     *Testimonial Evidence*

Plaintiff testified that she became a nurse in 1995 and worked as a nurse since that time. (R. 52). Plaintiff testified that her most recent employment was at the VA Clinic in Washington, Pennsylvania from October 2004 to May 2006. (R. 50). Plaintiff testified that she quit working in this position due to her medical conditions. (*Id.*).

Plaintiff further testified regarding her impairments, medical treatment and medications. Plaintiff testified the conditions that most interferes with her ability to work is "pain all over" and her depression. (R. 52). In June 2012, Plaintiff had her gallbladder removed. (R. 53). She had a cystoscopy in the spring of 2012 and laparoscopy in 2008. (*Id.*). Plaintiff also underwent a number of procedures, including scopes, colonoscopy, EGD, broken bones, a D&E and carpal tunnel injections. (R. 53-54). Plaintiff last engaged in physical therapy four to five years prior to the

administrative hearing. (R. 54). Plaintiff testified regarding her difficulty sleeping and her frequent migraine headaches, which occur about two times a week. (R. 6-63). She testified in detail regarding the symptoms associated with her fibromyalgia, which include pain all over her body, aching and stiff joints, numbness and tingling in her legs and hands as well as swelling in her hands. (R. 65).Plaintiff also described her cystitis and bladder problems, which result in constant pain and pressure in her pelvic area and the need to go to the bathroom approximately three times an hour. (R. 70-71).

Plaintiff listed her current medications, which include prescriptions for depression and anxiety, an estrogen-release patch for menopause, medicine for nausea related to migraines and oxycodone for her fibromyalgia and pain as well as numerous vitamins. (R. 54-55).

In regard to limitations, Plaintiff testified that she has difficultly squeezing objects in her hands, she cannot reach over her head, bend down, difficulty with repetitive motions and problems with concentration and focus. (R. 66-69).

Plaintiff also testified regarding her daily activities. Plaintiff stated that she is unable to do the things she previously was able to perform. (R. 52). She testified she lies in bed twenty-three hours a day and will only get up to go to the bathroom or to get something to eat. (*Id.*). Plaintiff further stated she has not seen her family, gone on family vacations, been shopping or gone "anywhere" since 2006. (*Id.*). She states that her mother and husband complete the housework. (*Id.*). She testified she has difficulty walking up a flight of stairs because she becomes short of breath, her legs are numb and she is in constant pain. (R. 53).

In regard to dressing and showering, Plaintiff stated that she uses a shower chair and her husband helps her wash her hair and clean her back and lower body because she has difficulty bending. (R. 55-56). Plaintiff stated that she does not cook but will heat food in the microwave. (R.

56). Plaintiff testified she does not do any shopping. (*Id.*). She does not do dishes or laundry or any housework. (*Id.*). Plaintiff uses a computer occasionally throughout the week. (R. 57).

**E.     *Vocational Evidence***

Also testifying at the hearing was Larry Bell a vocational expert. Mr. Bell characterized Plaintiff's past work as a nurse as medium and skilled. (R. 74). With regards to Plaintiff's ability to return to her prior work, Mr. Bell gave the following responses to the ALJ's hypothetical:

> Q:     Mr. Bell, assume a hypothetical individual of the same age, education and work experience as the Claimant who retains the capacity to perform sedentary work with a sit/stand option allowing the person to briefly, for one to two minutes, alternate sitting or standing positions at 30-mintue intervals without going off-task; who's limited to no foot control operations, bilaterally; who's limited to occasional postural, except no climbing of ladders, ropes or scaffolds, no kneeling, crouching, or crawling; whose overhead reaching is limited to occasional use, bilaterally; who must avoid all exposure to extreme cold and heat; who must avoid all exposure to excessive noise; who must avoid…all exposure to irritants; who must avoid all exposure to unprotected heights, hazardous machinery and commercial driving; whose work is limited to simple, routine and repetitive tasks requiring only simple decisions, free of fast-paced production requirements with few workplace changes; must have only occasional interaction with the public, coworkers and supervisors; and whose worksite must be located within 100 feet of a restroom. Can such an individual perform the past work of the Claimant as it was actually performed, or as it is customarily performed per the <u>DOT</u>?

> A:     No, Your Honor.

> Q:     Are there other jobs in the regional or national economy that such an individual could perform?

> A:     Yes, Your Honor. That hypothetical individual at the sedentary level, I believe, could function as a machine tender, sedentary and unskilled…or as a general sorter, sedentary and unskilled...

> Q:     Are those the only jobs such an individual could perform, or a sampling?

> A:     A sampling, Your Honor.

(R. 75).

The VE then responded to the ALJ's questions regarding customary tolerances for unexcused or unscheduled absences and breaks during the work day. (R. 76). The VE testified that missing two or more days of work per month would likely not be tolerated and that a fifteen minute break in the morning and one in the afternoon as well as thirty (30) to sixty (60) minute break for lunch is customary depending on the worksite. (*Id.*). The VE further testified that if an employee may be off-task more than ten (10) percent of the day than would eliminate competitive employment. (*Id.*).

Plaintiff's attorney then questioned the VE regarding further limitations placed on the hypothetical individual presented by the ALJ. (R. 77).

> Q:   How would sedentary work be affected by the inability to use both upper extremities for repetitive movements…not able to…sustain use throughout the day.
>
> A:   Well, if it's going to take them off-task for 10 percent or more of the time, then they wouldn't be able to do the job.
>
> Q:   Okay…would the jobs you described…require repetitive use of both upper extremities?
>
> A:   Yes.

(*Id.*).

### F. Additional Vocational Evidence

A report of contact form dated March 3, 2011 states that Plaintiff is limited to sedentary work with postural and environmental limitations. (R. 257). She retains the ability for work activity with limited contact with the general public. (*Id.*). While Plaintiff cannot return to her past job as a nurse, she can do other work, including lens block gauger, table worker and addresser, which accommodate her limitations. (*Id.*).

*G. Lifestyle Evidence*

On an Adult Function Report dated December 1, 2010, Plaintiff stated that she can barely take care of herself or get out of bed on most days due to "severe depression, anxiety, constant pain, chronic insomnia, dizziness, balance problems, tachycardia, blood pressure fluctuations and constant urination." (R. 239). Plaintiff explained that she lays in bed approximately ninety-five (95) percent of the day only getting up to go to the bathroom to get something to eat. (R. 240). She occasionally feeds her two cats but her husband or other family members mostly care for them. (*Id.*). In regard to personal care, Plaintiff needs help buttoning and zipping clothes, her husband assists her when bathing, shaving and caring for her hair. (*Id.*). Plaintiff stated she is able to feed herself and use the toilet by herself. (*Id.*). Plaintiff needs reminders to take her medicine. (R. 241). She very rarely prepares her own meals and her husband or mother does most of the cooking. (*Id.*). She does not perform any household chores or yard work because she is too depressed, experiences too much pain, dizziness, fluctuations in blood pressure and her doctors advised her that she is not allowed to lift more than five (5) pounds due to the cyst in her spine and is not allowed to strain herself. (R. 241-42). She does not leave the house alone because she is afraid she will fall or pass out and does not drive a car. (R. 242). She does shopping by the computer from home. (*Id.*). She does not manage her family's money and finances because of her "mind isn't the same" due to the pain, lack of sleep and memory impairment. (R. 243). Plaintiff's hobbies used to include fishing, bike riding, walking, crabbing, going to the beach and reading but she no longer engages in these activities because she doesn't "feel like doing anything because of depression, anxiety, pain, insomnia, etc." (R. 243). Plaintiff talks on the phone daily or every other day but has no other social interactions and has not attended family gatherings including weddings, funerals birthdays and holidays. (R. 243-44). She only leaves the house approximately once a month in

42

order to go to doctor appointments. (R. 243).

In regard to her abilities, Plaintiff checked every listed limitation including lifting, walking, concentration, memory, using hands and talking. (R. 244). Plaintiff stated she could only walk less than one (1) block and has to rest for about five (5) minutes before resuming walking again depending on how she is feeling that particular day. (R. 244). Plaintiff stated she can only pay attention for fifteen (15) to thirty (30) minutes and her concentration is decreased. (*Id*.). She explained that she does not handle stress well and is constantly anxious and worrying. (R. 245). Plaintiff further stated that she does not like to be around groups of people and has become more antisocial because of her health problems. (*Id.*).

Plaintiff completed a second Adult Function Report on March 28, 2011. (R. 256). In this report Plaintiff stated that all of her conditions cause "constant pain, anxiety, depression and insomnia." (*Id.*). She stated that she cannot think straight, concentrate or focus on one thing for very long, cannot complete tasks or stay in upright position for long due ot muscle spasms in her back and legs. (*Id.*). She also explained that she experiences frequent migraines, nausea and urination and that she needs to lie down often. (*Id.*). Plaintiff's statements regarding her daily activities were largely consistent with her prior report. (R. 257-260). Plaintiff does not care for any animals, does not complete an chores or yard work, does not cook, needs assistance with her personal care such as bathing and dressing, does not drive, does not track her family's finances, has no hobbies or activities, does not leave the house except for doctor appointments and does not attend family functions or social activities. (*Id.*). Plaintiff reported the same restrictions on her abilities, including difficulties lifting, standing, sitting and concentration. (R. 261).

### III.     CONTENTIONS OF THE PARTIES

Plaintiff asserts in her Motion for Summary Judgment that the Commissioner's decision "is arbitrary, contrary to law, and unsupported by substantial evidence." (Pl.'s Mot. at 1). Specifically, Plaintiff alleges that:

- The ALJ erred by failing to find Plaintiff disabled by not giving appropriate weight to Plaintiff's treating physicians.

- The ALJ failed to consider all of the evidence of the record, specifically all of the evidence provided by Dr. Nolan and Dr. Romano.

(Pl.'s Mem. in Supp. of Mot. for Summ. J. (Pl.'s Mem. at 6-14, ECF No. 12). Plaintiff requests that the "Case be reversed and benefits awarded, or in the alternative, that his case be remanded for proper consideration of all evidence and for proper consideration of Plaintiff's impairments and all the evidence of record." (*Id.* at 14).

Defendant, in his motion for summary judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that:

- The substantial evidence standard of review is highly deferential to the Commissioner's Decision.

- The ALJ followed the controlling regulations in evaluating the opinion evidence.

- The ALJ appropriately addressed the entire record.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 8-11, ECF No. 16).

### IV.     STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits…is limited to determining whether the findings…are supported by substantial evidence and

whether the correct law was applied. *See* 42 U.S.C. § 405(g) ("The findings…as to any fact, if supported by substantial evidence, shall be conclusive…"); *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase supported by substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))…If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence. *See Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, the language of § 205(g)…requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972). At the same time, the Court "must not abdicate [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir.1974) (citations omitted). "If the Commissioner's decision is not supported by substantial evidence in the record, or if the ALJ has made an error of law, the Court must reverse the decision*." Loving v. Astrue*, 3:11CV411-HEH, 2012 WL 4329283 (E.D. Va. Sept. 20, 2012) (citing *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987)).

# V.     DISCUSSION

## A.     *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following

five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement…or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings…and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based on all the relevant medical and other evidence in your case record 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at

one of the five steps, the process does not proceed to the next step. *Id.*

**B.      *Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

> 1. **The claimant last met the insured status requirements of the Social Security Act on December 31, 2011.**
>
> 2. **The claimant did not engage in substantial gainful activity during the period from her alleged onset date of October 28, 2009 through her date last insured of December 31, 2011 (20 CFR 404.1571 *et seq.*).**
>
> 3. **Through the date last insured, the claimant had the following severe impairments: chronic fatigue syndrome; fibromyalgia; obesity; headaches; posterior tachycardia; history of syringomyelia; paraesthesia of the extremities; chest pain; somatoform disorder; presumed growth hormone deficiency; thyroid nodule; suspected kidney lesion; gastroesophageal reflux; hypercholesterolemia; hypertriglyceridemia; endometriosis; depression; anxiety; gall bladder inflammation; cholelithiasis; and a history of cholecystectomy; potential benzodiazepines and narcotic drug addiction (20 CFR 404.1520(c)).**
>
> 4. **Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**
>
> 5. **Through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that the type of work must: provide a sit/stand option, allowing the person to change between sitting and standing for one to two minutes at 30 minute intervals without breaking task; entail no bilateral foot control operation; entail no kneeling, crouching, crawling, or climbing of ladders, ropes, or scaffolds and only occasional balancing, stooping, or climbing ramps/stairs; entail only occasional bilateral overhead reaching; entail no exposure to extreme hot and cold temperatures, noise, fumes, odors, dusts, gasses, poor ventilation, and hazards (i.e. unprotected heights or dangerous machinery); provide a work station within ten feet of the restroom; be limited to simple, routine, and repetitive tasks, requiring**

only simple decisions, no fast-paced production requirements, and few work place changes; and entail no more than occasional interaction with the public and co-workers.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on July 28, 1969 and was 42 years old, which is defined as a younger individual age 18-44, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because  using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the dated last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from October 28, 2009, the alleged onset date, through December 31, 2011, the date last insured (20 CFR 404.1520(g)).

(R. 23-35).

C.   *Analysis of the Administrative Law Judge's Decision*

1.   **Failure to Give Appropriate Weight to Plaintiff's Treating Physicians**

Plaintiff argues that the ALJ erred by failing to give the appropriate weight to Plaintiff's treating physicians, Dr. Aguirre and Dr. Romano. This section first outlines the treating physician rule and then separately addresses the ALJ's treatment of the medical opinions of Dr. Aguirre and Dr. Romano.

### a. Treating Physician Rule

20 C.F.R. § 404.1527(c) states "[r]egardless of its source, we will evaluate every medical opinion we receive." Treating source opinions are generally entitled to more weight because:

> these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). As such, the opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Bostic v. Astrue,* 474 F. App'x 952, 953 (4th Cir. 2012) (citing 20 C.F.R. § 404.1527(d)) (finding that "[t]he Commissioner generally gives controlling weight to medical opinions of a treating physician, but only if that opinion is consistent with the other evidence in the record."). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983).

However, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5.

Although a treating physician's opinion is not binding on the Commissioner, "a treating

physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." *Craig v. Chater*, 76 F. 3d 585, 589 (4th Cir. 1996). Therefore, "[t]he treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence.'" S*ee Hines v. Barnhart*, 453 F.3d 559, 563 n.2 (4th Cir. 2006) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).

When an ALJ does not give a treating source opinion controlling weight and determines that the Claimant is not disabled, the ALJ may assign a lesser weight to the opinion but:

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. This explanation may be brief.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). The following factors are used to determine the weight given to the opinion: 1) length of the treatment relationship and the frequency of examination, 2) the nature and extent of the treatment relationship, 3) the supportability of the opinion, 4) the consistency of the opinion with the record, 5) the degree of specialization of the physician, and 6) any other factors which may be relevant, including understanding of the disability programs and their evidentiary requirements. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ does not need to specifically list and address each factor in his decision, so long as sufficient reasons are given for the weight assigned to the treating source opinion. *See Pinson v. McMahon*, No. 3:07-1056, 2009 WL 763553, at *11 (D.S.C. Mar. 19, 2009) (holding that the ALJ properly analyzed the treating source's opinion even though he did not list the five factors and specifically address each one).

The Fourth Circuit has also noted that a court "cannot determine if findings are supported

by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984). Indeed, "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Ed. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977).

### b. Dr. Alfredo Aguirre, Treating Psychiatrist

Dr. Aguirre provided two medical assessments regarding Plaintiff's mental residual functional capacity. On September 1, 2009, Dr. Aguirre completed a Mental Residual Functional Capacity assessment, indicating marked and extreme impairments in Plaintiff's work-related abilities. (R. 606-09). Dr. Aguirre found five areas of moderate limitation, eight marked limitations and two extreme limitations in Plaintiff's ability to work. (*Id.*). Dr. Aguirre continued to treat Plaintiff after this initial assessment. He prescribed numerous medications to address Plaintiff's conditions, including Remeron, Valium and Ambien. Despite these medications, Plaintiff continued to report symptoms throughout 2011 and 2012. Dr. Aguirre then provided a second Mental Residual Functional Capacity Assessment on September 5, 2012, in which he again found marked and extreme impairments in Plaintiff's ability to work. (R. 613-16). Specifically, Dr. Aguirre found five areas of moderate limitations, ten areas of marked limitations and one area of extreme limitation. (*Id.*).

The ALJ found that "[l]ittle is accorded to the medical source statements prepared by Dr. Aguirre." (R. 33). The ALJ explained:

[Dr. Aguirre's] 2009 medical source statement has already been discounted by

51

Administrative Law Judge Cannon:

> …from examining the full record, Dr. Aguirre appears to have placed too great of weight on the claimant's subjective statements, and overstates her limitations. The reliability of the doctor's findings are called into question by his very limited history treating the claimant. Finally, the Administrative Law Judge believes that Dr. Aguirre's conclusions as to the claimant's limitations are overly severe and inconsistent with the full longitudinal record. Therefore, little weight is given to the findings and observations of Dr. Aguirre.

Exhibit B1A at ¶ 5. Dr. Aguirre's updated assessment does not rehabilitate his credibility as an expert. He has offered essentially the same assessment, and he offered no rationale supporting his conclusions. There is no evidence that the claimant has worsened significantly from a mental standpoint since the prior decision was issued.

(R. 33).

In assigning little weight to Dr. Aguirre's opinion, the ALJ need only be "sufficiently specific to make clear to any subsequent reviewers" the weight given to the treating source's medical opinion and the reasons for that weight. SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). The undersigned finds that the reasons provided by the ALJ are sufficient in explaining his decision to give little weight to Dr. Aguirre's medical opinions.

First, the ALJ reasoned that Dr. Aguirre's September 1, 2009 medical opinion had already been discounted by ALJ Cannon in the 2009 ALJ decision in part due Dr. Aguirre placing "too great of weight on the claimant's subjective statements, and [she] overstates her limitations." (R. 33). As discussed more fully below, the ALJ did not find Plaintiff to be credible, largely due to her drug-seeking behavior, overstatement of symptoms to providers and inconsistencies between her subjective allegations and the objective medical evidence. (R. 27-31). The ALJ provided a thorough analysis of his credibility determination, which supported his ultimate determination that Plaintiff was not credible. (*Id.*). The ALJ's explanation that Dr. Aguirre improperly relied on

Plaintiff's subjective statements, which were overstated, is a sufficient reason to give little weight to Dr. Aguirre's opinion.

Moreover, the ALJ noted that "[t]here is no evidence that the claimant has worsened significantly from a mental standpoint since the prior decision was issued." (R. 33). Dr. Aguirre's 2009 Mental Residual Functional Capacity Assessment is essentially the same as his 2012 Assessment, which demonstrates no major decline in Plaintiff's symptoms. The undersigned finds this reason in combination with the ALJ's full explanation to be sufficient in explaining why the ALJ gave little weight to Dr. Aguirre's opinion.

In addition, the ALJ stated that Dr. Aguirre's opinion lacks supportability because he "offered no rationale supporting his conclusions." (R. 33). While Plaintiff provided a letter from Dr. Aguirre to the Appeals Council that more fully explains the reasons for his opinion, the undersigned does not find that the letter might reasonably have changed the ALJ's conclusion that Plaintiff was not disabled.[1] *See Wilkins v. Sec'y, Dep't of Health and Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). The letter largely corroborates the findings as stated in Dr. Aguirre's treatment notes, which were included in the record and considered by the ALJ. (R. 618). Moreover, the ALJ included appropriate restrictions regarding Plaintiff's mental condition in the RFC that Plaintiff "be limited to simple, routine and repetitive tasks, requiring on simple decisions, no fast-paced production requirements, and few work place changes; and entail no more than occasional interaction with the public and co-workers." (R. 26). Based on the ALJ's review of the record, including Dr. Aguirre's treatment notes, and the inclusion of mental restrictions in Plaintiff's RFC,

[1] After the Appeals Council considers new and material evidence, the evidence is incorporated into the administrative record. Evidence is new if it is not "duplicative or cumulative." *Wilkins*, 953 F.2d at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Id.* Thus, the reviewing court "must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings." *Id.* As required by *Wilkins*, the Court considered the letter as it was incorporated into the record by the Appeals Council.

the letter is unlikely to change the outcome of the ALJ's ultimate finding of disability.

Accordingly, the undersigned finds that the ALJ provided sufficient reasons for assigning little weight Dr. Aguirre's Mental Residual Functional Capacity Assessments. Moreover, the ALJ's reasoning and ultimate RFC regarding her mental limitations is supported by substantial evidence in the case record. Therefore, the treating physician rule was properly applied and the case does not require remand on this issue.

### c.  Failure to Give Appropriate Weight to Dr. Romano's Medical Opinion

Plaintiff argues that the ALJ erred by giving little weight to the opinion of Plaintiff's treating specialist, Dr. Thomas Romano, M.D., Ph.D. (Pl.'s Br. at 6). Plaintiff first sought treatment from Dr. Romano, a physician who specializes in rheumatology and pain management, on January 6, 2011. (R. 518). Plaintiff consistently saw Dr. Romano, who conducted physical examinations, made referrals to additional specialists and prescribed Plaintiff medications on a regular basis through the date of the ALJ's decision. Dr. Romano diagnosed Plaintiff with severe fibromyalgia and severe myofasical pain syndrome. (R. 520).

Dr. Romano conducted a Physical Capacity Evaluation on April 1, 2011, in which he found numerous limitations and restrictions on Plaintiff's ability to work. (R. 494-95). Dr. Romano provided a second Physical Capacity Evaluation on September 2, 2011 that similarly reported limitations in Plaintiff's ability to work. (R. 516-17). Dr. Romano wrote a letter accompanying this evaluation that describes Plaintiff's medical history, her symptoms, treatment and his ultimate opinion that Plaintiff is unable to engage in full time employment. (R. 612).

The ALJ gave "little weight" to Dr. Romano's medical source statement from April 1, 2011. (R. 32, R. 494-95). The ALJ does not specify what weight was given to the September 2, 2011 opinion but does cite to the evaluation in reviewing Dr. Romano's medical opinions. (R. 33).

54

In explaining his reasoning for assigning little weight to Dr. Romano's opinion, the ALJ pointed out inconsistencies between Dr. Romano's medical opinion and other medical evidence in the record. (R. 33). First, the ALJ pointed to the fact that Dr. Romano found Plaintiff to be limited to three hours of sitting during the day but that this finding is at odds with the consultative examination findings of no limitations in sitting and that the objective studies of Plaintiff's back "failed to show significant abnormalities that could reasonably be expected to produce significant limitations sitting." (R. 32). The ALJ also discredited Dr. Romano's opinion because he "appears to have based a portion of his findings on the claimant's subjective complaints of fatigue," which the ALJ found to be "overstated," lacking in credibility and not able to be verified. (R. 32-33). The ALJ then cites to a portion of medical records from January 10, 2011 in which Dr. Romano describes Plaintiff's report of symptoms as demonstrating that Dr. Romano relied on Plaintiff's subjective symptoms in forming his opinion. (R. 33, R. 518). The ALJ notes that Dr. Romano found 18 tender points, which is sufficient to render a diagnosis of fibromyalgia. (R. 33). However, the ALJ states that upon physical examination Dr. Romano also found a decreased range of motion, "but these findings do not support the extreme functional limitations he has reported." (*Id.*). The ALJ concluded "there is no evidence that the claimant is unable to perform even a reduced range of sedentary work activities." (R. 33).

As explained above, in giving lesser weight to a treating source opinion, the ALJ's decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). In the present case, the ALJ gave little weight to Dr. Romano's opinion because his opinion was inconsistent

with other evidence in the medical record and he overly relied on Plaintiff's subjective allegations, which the ALJ previously found to be "overstated" and lacking in credibility. (R. 26-29, 32).

The undersigned will first address the ALJ's finding that Dr. Romano improperly relied on Plaintiff's subjective complaints in forming his medical opinion. A treating physician who gives an opinion on a Social Security claimant's physical limitations must necessarily consider the claimant's subjective statements in combination with other objective medical evidence. *See Bjornson v. Astrue*, 671 F.3d 640, 646 (7th Cir. 2012); *see also Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir. 1997) (noting that "[a] patient's report of complaints, or history, is an essential diagnostic tool."); *Embrey v. Bowen*, 849 F.2d 418, 422 (8th Cir. 1988) (finding that "[t]he subjective judgments of treating physicians are important, and properly play a part in their medical evaluations."); *Brand v. Sec'y, Dept. of Health, Educ., and Welfare*, 623 F.2d 523, 526 (8th Cir. 1980) (stating that "[a]ny medical diagnosis must necessarily rely upon the patient's history and subjective complaints."). However, the fact that a medical provider memorializes a patient's subjective complaints in medical records does not transform the complaints into objective medical findings. *See Craig*, 76 F.3d at 590 n.2.

Moreover, in cases involving fibromyalgia, the treating source's opinion, particularly a specialist, and consideration of a plaintiff's subjective complaints are given an elevated importance. *See Loving v. Astrue,* 3:11CV411-HEH, 2012 WL 4329283 *5 (E.D. Va. Sept. 20, 2012) (stating that "in cases where fibromyalgia is purportedly causing a plaintiff's disability, the treating physician rule is bolstered when a plaintiff is seeing a specialist."). Generally, "the Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." *Kelly v. Callahan*, 133 F.3d 583, 589 (8th Cir.1998). This deference to a treating specialist is

critical "[w]hen evaluating the presence and impact of fibromyalgia" because of the "the unique problems in diagnosing the disease and evaluating its impact on the patient." *Loving*, 2012 WL 4329283, at *5. Numerous courts have recognized that fibromyalgia's "symptoms are entirely subjective and [that] there are no laboratory tests that can confirm the presence or severity of the syndrome." *Stahlman v. Astrue*, No. 3:10CV475, 2011 U.S. Dist. LEXIS 67715, at *21, 2011 WL 2471546 (E.D. Va. May 17, 2011) (citing *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir.1996)); *see also Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 245 (6th Cir.2007) (stating that "in light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant.") (citation omitted); *Green–Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir.2003) (observing that fibromyalgia "eludes" objective testing and that "'objective' findings are not required in order to find that an applicant is disabled") (quoting *Donato v. Sec. of Dep't of Health and Human Servs.*,721 F.2d 414, 418–19 (2d Cir.1983)). Due to the "subjective nature of diagnosing fibromyalgia:"

> in person assessments take on a heightened significance, as they represent the best means for assessing the patient's condition. Thus, the law and reason require the opinions of the treating rheumatologist be accorded far more weight than those of non-treating and non-specialist physicians, so long as the opinions are 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence.'

*Loving*, 2012 WL 4329283, at *5 (citing 20 C.F.R. § 404.1527(c)(2)).

Based on the case law cited above, it appears it would be improper for an ALJ to assign little weight to a treating specialist's medical opinion solely because the physician considered a claimant's subjective complaints, along with objective medical evidence, in forming their medical opinion. This proves even more important in cases involving fibromyalgia, in which many of the

symptoms are entirely subjective. However, in the present case, the ALJ's concern regarding Plaintiff's credibility helps shed light on the ALJ's apprehension to fully accept Dr. Romano's medical opinion due to his overreliance on Plaintiff's subjective reports of her symptoms. (R. 31). The ALJ thoroughly explained in his decision that he found Plaintiff to not be credible and substantially outlined these reasons. (R. 27-31). Notably, the ALJ found that Plaintiff had exhibited drug-seeking behavior, "a fact that naturally lends itself to overstating symptoms to obtain more medications." (*Id.*). The ALJ outlined numerous other reasons in finding Plaintiff's credibility to be wanting, which are discussed in full below. Here, the ALJ did not merely reject Dr. Romano's opinion because he relied on Plaintiff's subjective symptoms, but because he relied on subjective symptoms that the ALJ had already found to be overstated. (R. 32). In addition, Dr. Romano's consideration of subjective allegations was not the sole reason the ALJ gave in discrediting Dr. Romano's opinions.

The ALJ also gave little weight to Dr. Romano's medical opinions because his opinions were inconsistent with other medical evidence in the record. (R. 33). The ALJ outlined specific reasons, including inconsistencies related to Plaintiff's limitations on sitting, the extent of her functional limitations associated with a decreased range of motion and the lack of evidence showing Plaintiff is unable to perform a reduced range of sedentary work activities. (*Id.*). The undersigned finds these reasons sufficient to explain the assignment of lesser weight to Dr. Romano's opinions by demonstrating that Dr. Romano's opinions are inconsistent with other substantial medical evidence. The ALJ also thoroughly explained his reasoning in finding Plaintiff not credible, which casts doubt on her report of subjective allegations not only to the Commissioner, but also to her treating physicians. The undersigned further finds that the ALJ sufficiently explained his reasoning in assigning little weight to Dr. Romano's medical opinions

based on his overreliance on Plaintiff's subjective complaints, which the ALJ found to be overstated and unreliable. Accordingly, the undersigned finds that the ALJ properly followed the treating physician rule in regard to Dr. Romano's opinions.

### 2. Failure to Properly Evaluate Plaintiff's Fibromyalgia Diagnosis

Plaintiff argues that the ALJ failed to comply with the Commissioner's own policies in evaluating the severity of Plaintiff's fibromyalgia. (Pl.'s Br. at 9). Social Security Ruling 12-2p defines fibromyalgia as a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2P (S.S.A July 25, 2012). The rule states that fibromyalgia can be the basis for a finding of disability and outlines the general criteria that can establish has a medical determinable impairment of fibromyalgia, which includes a history of widespread pain, at least eleven of eighteen specific tender points or repeated manifestations of six or more fibromyalgia symptoms (such as manifestations of fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety, or irritable bowel syndrome) as well as evidence of examinations that rule out other diagnoses that could cause the symptoms. (*Id.*). The ruling further explains that "[w]hen a person alleges fibromyalgia, longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment." (*Id.*). When determining the residual functional capacity of a person with fibromyalgia, the Commissioner "will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'" (*Id.*). However, the Fourth Circuit has also noted that "[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working, but most do not." *Stup v. UNUM Life Ins. Co. of Am.*, 390 F.3d 301, 303 (4th Cir. 2004).

When evaluating a person's statements about his or her symptoms and functional limitations associated with fibromyalgia, SSR 12-2p directs the ALJ to follow the two-step process as set forth in SSR 96-7p. The Fourth Circuit case, *Craig v. Chater*, outlines this two-step process used to determine whether a person is disabled by pain or other symptoms. *Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996); *see also* SSR 96-7p (S.S.A. July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. *Id.* at 594; *see also Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). For fibromyalgia, this means that there "must be medical signs and findings that show the person has a [medically determinable impairment] which could reasonably be expected to produce the pain or other symptoms alleged." SSR 12-2p. The SSA already determined that fibromyalgia is a medical determinable impairment that "satisfies the first step of our two-step process for evaluating symptoms." *Id.* Second, once this threshold determination has been made, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record. *See Craig*, 76 F.3d at 594; *Hines*, 453 F.3d at 565. The fibromyalgia ruling further explains that the Commissioner is to:

> evaluate the intensity and persistence of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for work. If objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms. As we explain in SSR 96-7p, we will make a finding about the credibility of the person's statements regarding the effects of his or her symptoms on functioning.

SSR 12-2p. Moreover, the Fourth Circuit has held that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional

circumstances.'" *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir.1997) (internal citations omitted).

Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

> [t]he individual's daily activities; The location, duration, frequency, and intensity of the individual's pain or other symptoms; Factors that precipitate and aggravate the symptoms; The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and, Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984).

The existence of objective medical evidence is not required to support or corroborate claimant's subjective complaints of pain or other symptoms. The Fourth Circuit clarified:

> There is, of course, a fundamental difference between objective evidence of pain (which is not required) and objective evidence of a medical condition which could cause the pain alleged (which is). Requirement of the former is obviously not the law, for the simple reason that pain, a subjective phenomenon, although sometimes objectively verifiable, often will not be. Objective evidence of the pain the claimant feels is thus, quite sensibly, not required for entitlement to benefits. 20 C.F.R. §§ 416.929(c) & 404.1529(c). However, the latter - objective evidence of a condition 'which could reasonably be expected to produce the pain or other symptoms

61

> alleged' - equally sensibly, is required by the Secretary's regulation. 20 C.F.R. §§
> 416.929(b) & 404.1529(b)).

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996). Moreover, "[a]lthough a claimant's

allegations about her pain may not be discredited solely because they are not substantiated by

objective evidence of the pain itself or its severity, they need not be accepted to the extent they are

inconsistent with the available evidence, including objective evidence of the underlying

impairment, and the extent to which that impairment can reasonably be expected to cause the pain

the claimant alleges she suffers." *Id*. at 595.

In the present case, the ALJ found that Plaintiff's "medically determinable impairments

could reasonably be expected to cause the alleged symptoms; however, [her] statements

concerning the intensity, persistence and limiting effects of these symptoms are not credible." (R.

27). The ALJ specifically found that Plaintiff's fibromyalgia is a severe impairment. (R. 24).

However, the ALJ did not find Plaintiff's subjective allegations regarding the severity of her

symptoms to be credible. (*Id.*). In support of her credibility determination, the ALJ reviewed the

medical evidence and pointed to specific instances in the record that called into question Plaintiff's

credibility.

The ALJ provided a thorough analysis of Plaintiff's medical records from December 2009

to 2012 in demonstrating that Plaintiff's subjective symptoms were inconsistent with the medical

evidence of record. (R. 28-30). The ALJ discusses Plaintiff's treatment by her primary care

physician, Dr. Sokos, in December 2009, her psychiatric treatment by Dr. Aguirre in December

2009, her inpatient hospitalization at Ohio Valley Medical Center in December 2009, her pain

management by Dr. Sharma in March 2010, her consultative examinations in January 2011 with

Dr. Sella and Ms. Mansuetto and Dr. Krieg, her urinary urgency and suprapubic pain problems

assessed by Dr. Kulkarni in April 2012, and her gallbladder surgery by Dr. Raves in March 2012. (*Id*). The ALJ concluded that these records demonstrate "no solid evidence of worsening symptoms, and it appears that the claimant's condition is substantially similar to what it was in October 2009." (R. 32).

The ALJ also pointed to specific examples in support of her credibility determination. The ALJ explained that that on physical examination, Plaintiff often appeared in no physical distress and had 5/5 motor strength in all of her extremities; the ALJ found that "[t]hese findings are not consistent with the claimant's allegations…One might expect her to present in significant distress and have reduced strength with noticeable atrophy if she was truly bedridden 23 hours out of the day." (R. 28). The ALJ also noted that in July 2010, MRIs of the lumbar and thoracic spines showed no herniations or stenosis and that Plaintiff's lower dorsal syrinx had resolved. (R. 30). The ALJ further commented that Plaintiff reported in August 2010 that her narcotic medications were "'enabling her to function,' an admission contrary to her allegations.'" (*Id.*).

The ALJ weighed evidence both in support and in opposition to Plaintiff's credibility. Ultimately, the ALJ concluded:

> there is no question that the claimant has had a considerable amount of treatment, and her problem list is significant with diagnoses such as fibromyalgia, depression, anxiety, chronic fatigue, and multiple endocrinological issues. Yet, her allegations are so extreme that they appear implausible. She has reported significant fatigue and pain consistently to her physicians, and they appear to accept these complaints as genuine. However, these complaints are not buttressed by objective testing, and they are simply not objectively verifiable.

(R. 31). The ALJ further credited the fact that Plaintiff has made "consistent reports of fatigue, pain, and depression to her physicians, and she has had considerable treatment. She also has a good work record." (*Id.*). However, the ALJ noted that her credibility was found wanting by ALJ Cannon in 2009 and that "without significant objective support for her allegations, it is difficult to

credit her complaints of worsening symptoms." (*Id.*). The ALJ further stated that Plaintiff has demonstrated drug-seeking behavior, which is "a fact that naturally lends itself to overstating symptoms to obtain more medications." (*Id.*).

The undersigned finds that based on these reasons, the ALJ properly supported her credibility determination. However, the undersigned does note that in finding Plaintiff not credible, the ALJ improperly relied on the lack of objective medical evidence to verify Plaintiff's subjective allegations. (R. 31). The law does not require objective medical evidence to support a Plaintiff's subjective allegations, only that objective medical evidence exists to demonstrate the existence of an underlying medical condition "which could cause the pain alleged." *Craig*, 76 F.3d at 594-95. Despite this error, the ALJ adequately supported his credibility determination with other proper reasons, including evidence from Plaintiff's own statements, as well as objective findings from the record. The ALJ determined that Plaintiff's complaints are not credible based on the previous ALJ's finding that claimant was not credible, the likelihood of Plaintiff overstating or exaggerating her symptoms, Plaintiff alleging difficulty with virtually every possible physical and mental ability and the absence of objective medical evidence corroborating the severity of Plaintiff's symptoms and associated limitations. (R. at 26-33). Therefore, the ALJ properly evaluated the severity of Plaintiff's fibromyalgia by finding Plaintiff's subjective reports concerning the severity of her symptoms to not be fully credible. Accordingly, the undersigned finds that substantial evidence supports the ALJ's credibility determination.

### 3. ALJ Failed to Consider All the Evidence of the Record

#### a. Failure to Consider Plaintiff's Treatment by Dr. Nolan

Plaintiff contends that the ALJ erred by failing to consider the medical records and opinion of Dr. Sean Nolan, an endocrinologist. Plaintiff argues that the ALJ's failure to discuss Dr. Nolan's

opinion is error, particularly because his opinion further substantiates the testimony and medical history of Plaintiff. (Pl.'s Br. at 13). Defendant argues that the ALJ expressly considered "the entire record." (Def.'s Br. at 11).

Dr. Romano referred Plaintiff to Dr. Sean Nolan for an initial hormone evaluation and detailed endocrinologic assessment on July 19, 2011. (R. 498). Dr. Nolan reviewed Plaintiff's medical history, conducted a physical examination and ordered a number of laboratory tests. (R. 498-99, 513, 514). On September 6, 2011, Dr. Nolan wrote Dr. Romano a letter explaining his findings and recommendations in moving forward with Plaintiff's case. (R. 534). In assessing Plaintiff's condition, Dr. Nolan reported that "she has become overwhelmed by the number of symptoms and their negative influence on her quality of life." (*Id.*). Dr. Nolan explains that Plaintiff has had severe hot flashes for three to four years, she sweats constantly, she lies in bed all day, she has become depressed, she has severe constipation, she has GERD, she has IBS, her gallbladder is diseased, her hair is thinning, she is severely weak and fatigued, she has become hermetic and does not leave her home, she has tachycardia on very minimal exertion. (*Id.*).

Dr. Nolan concluded that Plaintiff "presents a very difficult management situation." (*Id.*). He noted that her main current issue appears to be pelvic in origin and that she seems to have Endometriosis Syndrome based on her constant pelvic pain, severe vaginal discomfort, severe hot flashes and estrogen deficiency. (*Id.*). Dr. Nolan stated he would be highly in favor of a total hysterectomy with full estrogen replacement and recommended follow-up with Plaintiff's gynecologist, Dr. DeGuzman. (*Id.*).

The ALJ is required to review the entire record in assessing whether the claimant has a disability. "[A]lthough an ALJ has no duty to comment on every piece of evidence or testimony presented, he or she must articulate some minimal analysis of the evidence to enable the reviewing

court to track the ALJ's reasoning and be assured that the ALJ considered the most important evidence." *Lilly v. Astrue*, No. 5:07CV77, 2008 WL 4371499, at *3 (N.D. W. Va. Sept. 22, 2008) (Stamp, J.) (quoting *Green v. Shalala*, 51 F.3d 96 (7th Cir. 1995)) (internal quotations omitted).

In the present case, Plaintiff is correct that the ALJ does not discuss Plaintiff's treatment by Dr. Nolan, or even her treatment generally by an endocrinologist. Dr. Nolan's treatment notes demonstrate the continuation of Plaintiff's symptoms of pain and fatigue, the worsening of her endocrinologic problems and the overall complexity of Plaintiff's medical conditions and difficulty treating her. (R. 498-99, 534-35). Dr. Nolan notes that Plaintiff is "severely weak and fatigued" and that she has "tachycardia on very minimal exertion." (R. 534). His endometriosis diagnosis also helps to explain Plaintiff's constant pelvic pain, severe vaginal discomfort, severe hot flashes and estrogen deficiency. Dr. Nolan ultimately diagnosed Plaintiff with endometriosis syndrome and recommended a hysterectomy with full estrogen replacement. (R. 535).

While the ALJ does not discuss Dr. Nolan's treatment, the ALJ did find endometriosis as a severe impairment (R. 24) and stated that he reviewed "the entire record." (R. 23). Considering Plaintiff's treatment by multiple specialists and consultative examiners and the ALJ's thorough discussion of this medical evidence in the record, the ALJ's failure to specifically comment on Dr. Nolan's treatment notes is harmless error.

Under the harmless error doctrine, "[t]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008); *see also Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (stating that "[t]he doctrine of harmless error…is fully applicable to judicial review of administrative decisions"); *Hurtado v. Astrue*, 2010 WL 3258272, at *11 (D.S.C. July 26, 2010)

(finding that "[t]he court acknowledges there may be situations in which an error in an opinion is harmless because it would not change the outcome of the ALJ's decision"); *cf. Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) (explaining that "[w]hile the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.").

While the ALJ must provide "some minimal analysis of the evidence," the ALJ is also not required "to comment on every piece of evidence." *Lilly*, 2008 WL 4371499, at *3. In the present case, the ALJ considered the most important and relevant evidence related to Plaintiff's mental and physical impairments in formulating Plaintiff's RFC. (R. 26-32). Moreover, Dr. Nolan's ultimate diagnosis was adopted by the ALJ who found that Plaintiff had endometriosis as a severe impairment. (R. 24). The undersigned finds that the ALJ's failure to specifically comment on Dr. Nolan's treatment notes would have no bearing on the ultimate decision reached by the ALJ. Accordingly, this error is harmless.

### b. Failure to Consider Medical Records by Dr. Romano

Plaintiff also argues that the ALJ erred by failing to consider all of the evidence provided by Dr. Romano. (Pl.'s Br. at 12; Resp. at 1). In the ALJ's decision, he provides a chronological review of Plaintiff's medical treatment from December 2009 to her surgery to remove her gallbladder in June 2012. (R. 28-30). During this overview of records, the ALJ did not mention Plaintiff's treatment by Dr. Romano, a specialist in the area of rheumatology and pain management. Dr. Romano treated Plaintiff consistently, seeing her for appointments on a monthly basis, from January 6, 2011 (R. 518) through July 9, 2012 (R. 567). Throughout these

appointments, Plaintiff constantly reported pain, problems with her activities of daily living, fatigue and sleep deprivation. Dr. Romano diagnosed Plaintiff with severe fibromyalgia and myofascial pain syndrome and treated her for these conditions with a combination of medications that he prescribed and monitored.

The ALJ specifically notes that he considered "the entire record" in formulating his decision. (R. 23). Moreover, the ALJ found that Plaintiff suffered from fibromyalgia as a severe impairment. (R. 24). After considering Plaintiff's medical impairments and symptoms, the ALJ then limited Plaintiff to a reduced range of sedentary work (R. 25-26). The ALJ further considered and gave little weight to Dr. Romano's medical opinions, which demonstrates the ALJ was in fact aware that Dr. Romano was a treating specialist in Plaintiff's case. (R. 32-33). The ALJ's failure to specifically cite to Dr. Romano's treatment notes when providing an overview of the medical evidence is harmless error and does not require remand in this instance.

### c. Somatization Diagnosis by Dr. Nolan and Dr. Romano

Plaintiff argues that the record indicated that Plaintiff has been diagnosed with somatization or somatoform disorder. (Pl.'s Br. at 13). Plaintiff explains that the records of both Dr. Nolan and Dr. Romano demonstrate the "extreme difficulty and measures that were taken to find an effective treatment for Plaintiff." (*Id.*). As discussed above, the ALJ does not discuss Dr. Nolan's or Dr. Romano's medical records. The ALJ does give little weight to Dr. Romano's medical opinions. (R. 33). While the ALJ may not have specifically referenced Dr. Nolan and Dr. Romano's medical records, the ALJ did find that one of Plaintiff's severe impairments was somatoform disorder. (R. 24). Therefore, the undersigned finds that the ALJ's failure to specifically attribute the somatoform diagnosis to Dr. Nolan or Dr. Romano is harmless error.

## VI.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 12) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 15) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this September 24, 2014.

_____
ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE

69